DAVID P. CLAIBORNE
[Idaho State Bar No. 6579]
EVAN T. ROTH
[Idaho State Bar No. 9033]
KATIE L. VANDENBERG
[Idaho State Bar No. 10969]
SAWTOOTH LAW OFFICES, PLLC
Golden Eagle Building
1101 W. River Street, Ste. 110
P. O. Box 7985
Boise, Idaho 83707
Telephone: (208) 629-7447
Facsimile: (208) 629-7559
E-mail: david@sawtoothlaw.com
       evan@sawtoothlaw.com
       katiev@sawtoothlaw.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO (SOUTHERN DIVISION)

| | |
|---|---|
| **SELKEY BUHL, LLC**, a Wisconsin limited liability company;<br><br>     Plaintiff,<br><br>  vs.<br><br>**SENECA FOODS CORPORATION**, a New York corporation;<br><br>     Defendant. | Case No. _____<br><br>**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL** |

**COMES NOW** the Plaintiff, Selkey Buhl, LLC, by and through its attorneys of record,

Sawtooth Law Offices, PLLC, and as a complaint and cause of action against Defendant, Seneca

Foods Corporation, hereby complains and alleges as follows:

*Verified Complaint and Demand for Jury Trial - Page 1 of 17*

## PARTIES

1.     Selkey Buhl, LLC (hereinafter "Selkey Buhl") is, and was at all times pertinent herein, a limited liability company duly organized and existing under the laws of the State of Wisconsin, with its principal place of business in Cedar Grove, Wisconsin, but regularly conducting business in the State of Idaho, primarily in the County of Twin Falls.  All of its members are citizens of Wisconsin.

2.     Seneca Foods Corporation (hereinafter "Seneca") is, and was at all times pertinent herein, a corporation duly incorporated and existing under the laws of the State of New York, with its principal place of business in Marion, New York, but has owned and sold real property in the State of Idaho, primarily in the County of Twin Falls.

## JURISDICTION

3.     Selkey Buhl is a citizen of the State of Wisconsin.  Seneca is a citizen of the State of New York.  As such, the Plaintiff herein and the Defendant herein are citizens of different states.

4.     The amount in controversy in this action, exclusive of interest and costs, exceeds the sum of $75,000.

5.     This Court has jurisdiction over this matter based upon diversity of citizenship, pursuant to 28 U.S.C. § 1332.

6.     Seneca is subject to personal jurisdiction within this Court's jurisdictional boundaries pursuant to IDAHO CODE § 5-514 because Seneca, on one or more occasions, has transacted business within the State of Idaho, as that term is defined by IDAHO CODE § 5-514.

7.     Seneca is subject to personal jurisdiction within this Court's jurisdictional boundaries pursuant to IDAHO CODE § 5-514 because Seneca, on one or more occasions, has used and

*Verified Complaint and Demand for Jury Trial - Page 2 of 17*

possessed real property located in Twin Falls County, Idaho, which said use and possession, in part, is the subject of this action.

## VENUE

8.   A substantial part of the events or omissions giving rise to the claims alleged herein occurred within this Court's jurisdictional boundaries.

9.   Venue is appropriate with this Court pursuant to 28 U.S.C. § 1391(b)(2) and/or 28 U.S.C. § 1391(b)(3).

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

10.   On or about August 30, 2018, Selkey Buhl acquired ownership, by warranty deed from Seneca, of certain real estate located in Twin Falls County, Idaho, and more particularly described and set forth in the warranty deed, a true and correct copy of which is attached hereto as **Exhibit A**, which said description is hereby incorporated herein as if set forth in full hereat (hereinafter "the Premises").

11.   Before Selkey Buhl acquired ownership of the Premises, it entered into a "Purchase and Sale Agreement" with Seneca, a true and correct copy of which is attached hereto as **Exhibit B**, which said document is hereby incorporated herein as if set forth in full hereat.  The Purchase and Sale Agreement governed the terms of the sale of the Premises by Seneca to Selkey Buhl.

12.   Among other terms, the Purchase and Sale Agreement provided that the purchase price for the Premises would be nine million seven hundred thousand dollars ($9,700,00.00), *see* Ex. B, § 4, p. 1, that Seneca would disclose "any and all written and/or oral lease agreements relating to real and/or personal property," and "any other documents within custody and control of Seller which is reasonably requested by the Buyer," *see* Ex. B, § 6.1(iv), pp. 3, 18, and that "Buyer will assume those obligations with respect to the Property as are expressly stated in Section 5.  Buyer

does not agree to assume any other obligations with respect to the Property except for those obligations stated in Section 5." *Id.* at § 19, p. 7.

13.  The Purchase and Sale Agreement also provides that "[t]his Agreement shall be binding upon the heirs, administrators, executors, successors and assigns of the parties hereto and shall survive the closing of this transaction." *Id.* at § 34, p. 10.

14.  A Bill of Sale also accompanied the Purchase and Sale Agreement, a true and correct copy of which is attached hereto as **Exhibit C**, which said document is hereby incorporated herein as if set forth in full hereat.  The Bill of Sale, which was executed by Seneca, transferred certain personal property from Seneca to Selkey Buhl, and provides that "[a]ll items of Personal Property remaining upon the Land at the time of Closing shall be presumptively considered to be that of the Seller . . . ." *See* Ex. C, p. 5.

15.  Seneca promised represented and warranted that all personal property being conveyed to Selkey Buhl was free and clear of liens and encumbrances.  *See* Ex. B, § 16, p. 6.

16.  However, Seneca failed to disclose to Selkey Buhl a "lease arrangement" with Idaho Power for use of electrical equipment and facilities located on the Premises, of which Seneca had actual knowledge.

17.  Based upon information and belief, Idaho Power began installing electrical equipment and facilities (hereinafter "Idaho Power Facilities") upon the Premises as early as 1970, where said installation continued intermittently until 2018.  These Idaho Power Facilities were located on the Premises on the date of Closing, and were not transferred by specific reference to Selkey Buhl in the Bill of Sale or the Purchase and Sale Agreement.

18.   On information and belief, Seneca, when it owned the Premises, was charged a monthly facility charge for the Idaho Power Facilities located on the Premises.  Seneca paid that monthly facility charge to Idaho Power.

19.   On information and belief, Seneca did not use the Idaho Power Facilities for a period of time, but continued to pay the monthly facility charge for that period of non-use consistent with Seneca paying off a prior Seneca purchase from Idaho Power.

20.   On information and belief, Seneca's payment of the monthly facility charge prevented Idaho Power from removing the Idaho Power Facilities from the Premises and from charging Seneca approximately $649,599.00 to buyout the facilities.  Seneca's monthly payment also prevented Idaho Power from filing a lien against Seneca, which would have given notice to Selkey Buhl prior to the real estate closing of Idaho Power's claim against the Premises for the Idaho Power Facilities.  A true and correct copy of the most recent purchase price for the Idaho Power Facilities is attached hereto as **Exhibit D**, which said document is hereby incorporated herein as if set forth in full hereat.

21.   When Ray Selk, member of Selkey Buhl, LLC, toured the Premises, a Seneca representative showed Mr. Selk a room full of electrical transformers and expressed great pride and admiration of the equipment and facilities and their capabilities.

22.   Prior to the closing, Mr. Selk asked the Seneca representative numerous times how much Seneca was charged by Idaho Power for power on a monthly basis when in operation and to see a monthly statement so that he could properly budget for Idaho Power utility charges.

23.   The Seneca representative refused to answer the question directly and instead referred Mr. Selk to Idaho Power.

24.   When Mr. Selk contacted Idaho Power, Idaho Power refused to divulge the customer's information to him as a third party.

25.   Mr. Selk reported his inability to get the information from Idaho Power to the Seneca representative, but the Seneca representative failed to notify Idaho Power with permission to release the information to Mr. Selk.

26.   At some point before closing, Mr. Selk became aware of a monthly user expense charged to the Premises by Idaho Power in the amount of approximately $7,000.

27.   On information and belief, in reality, the total amount of the monthly bill paid to Idaho Power by Seneca for the lease and other associated charges exceeded $30,000.00.

28.   However, Mr. Selk was never able to obtain a complete bill or any additional information from Idaho Power before the purchase was completed.  Because Mr. Selk believed that the monthly user charge was the only Idaho Power expense incurred by Seneca, Mr. Selk found Seneca's  failure to provide a monthly utility bill an annoyance, but never expected the failure to conceal a monthly bill that exceeded $30,000.00 and an associated claim for $649,599.00 by Idaho Power for its Facilities located on the Premises.

29.   Selkey Buhl did not receive notice of the Idaho Power Facilities lease agreement and associated claim against it to buy out the Facilities for $649,599.00 until several months after Selkey Buhl closed on and took possession of the Premises.

30.   Selkey Buhl contacted Seneca about the Idaho Power Facilities and associated claim after it received notice of the same, but Seneca refused to be liable for the balance of the lease Seneca failed to reveal, and also refused to work with Selkey Buhl on reaching a resolution to the issue. Attached hereto as **Exhibit E** is a true and correct copy of a letter that was sent to Seneca

regarding the failure to disclose the lease agreement for the Idaho Power Facilities, which said document is hereby incorporated herein as if set forth in full hereat.

31.   This lease agreement and its associated $649,599.00 claim by Idaho Power was material to the purchase and sale of the Premises, and was required to be disclosed by Seneca to Selkey Buhl before it purchased the Premises.

## FIRST CLAIM FOR RELIEF - BREACH OF CONTRACT

32.   A valid and binding contract exists between Selkey Buhl and Seneca, as represented by the Purchase and Sale Agreement and Bill of Sale, and as more fully alleged herein.

33.   Seneca is in breach of said contract.

34.   As a result of Seneca's breach of its contractual relationship with Selkey Buhl, Selkey Buhl has been damaged in an amount to be proven at trial, but alleged to be in excess of $649,599.00, exclusive of interest and costs.

## SECOND CLAIM FOR RELIEF - BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

35.   The contract between Selkey Buhl and Seneca, as alleged herein, included a covenant, implied by law, of good faith and fair dealing.

36.   In the event Seneca forgot its $649,599.00 lease balance when Selkey Buhl requested the past monthly utility charge for budgeting purposes, Seneca would have been alerted to Seneca's failure to disclose Seneca's lease balance obligation.

37.   Seneca is in breach of said covenant of good faith and fair dealing.

38.   As a result of Seneca's breach of the covenant of good faith and fair dealing, Selkey Buhl has been damaged in an amount to be proven at trial, but alleged to be in excess of $649,599.00, exclusive of interest and costs.

### THIRD CLAIM FOR RELIEF – FRAUD OR INTENTIONAL MISREPRESENTATION

39.  Seneca made a representation to Selkey Buhl that it disclosed all leases to Selkey Buhl when it signed the Purchase and Sale Agreement.

40.  Seneca also made a representation to Selkey Buhl that all of the tangible personal property located on the Premises was owned by Seneca, unless specifically stated otherwise, and was being transferred to Selkey Buhl.

41.  These representations were proven false, as several months after Selkey Buhl purchased the Premises from Seneca, Selkey Buhl discovered that Seneca intentionally failed to disclose a lease arrangement with Idaho Power for its facilities located on the Premises.

42.  On information and belief, Seneca intentionally performed specific actions by making monthly payments to Idaho Power prior to the sale closing date which Seneca knew or should have known resulted in the concealment, from Selkey Buhl, of Seneca's lease with Idaho Power, and hid the true ownership of Idaho Power's facilities located on the sale premises.

43.  On information and belief, Seneca knew or should have known Seneca's monthly payments to Idaho Power would prevent Idaho Power from filing a lien against Seneca.

44.  On information and belief, Seneca knew or should have known that by Seneca making monthly payments to Idaho Power, Seneca prevented Idaho Power from commencing litigation for breach of lease or from filing a lien.

45.  By the terms of the Purchase and Sale Agreement, Seneca was obligated to do a title search and reveal all claims of interest by others in the property for sale and Seneca knew or should have known Seneca's monthly payments to Idaho Power prevented a lien or litigation from Idaho Power from being revealed in the title insurance policy to Selkey Buhl.

*Verified Complaint and Demand for Jury Trial - Page 8 of 17*

46.   Seneca knew or should have known when the Seneca representative extolling the pride and capabilities of the room full of electrical transformers that Selkey Buhl would believe, without being told otherwise, that the room full of electrical, expensive transformers were part of the sale and a reason to justify the sale price.

47.   Seneca knew or should have known that if Seneca breached its undisclosed lease with Idaho Power and refused to pay the remaining lease balance of $649,599.00 that Selkey Buhl would be forced, after the purchase of the property from Seneca, into an expensive electrical power bind and that Selkey Buhl would have to pay Seneca's balance with Idaho Power to prevent the removal of the transformers, or otherwise endure the time of disruption of business for the removal and replacement of the transformers.

48.   The intentional failure to disclose the lease was important and material to the transaction, as it was accompanied by a claim for over $600,000, an expense that was not known or anticipated by Selkey Buhl.

49.   Seneca knew that its representations were false when it executed the Purchase and Sale Agreement and the Bill of Sale, as Seneca knew that the lease existed, had paid the monthly amount due for the lease, and knew that Selkey Buhl was not able to obtain Idaho Power information regarding the lease, since Mr. Selk notified the Seneca representative that Idaho Power would not release the information to him as a third party.

50.   Selkey Buhl was not aware of the falsity of the representations when the Purchase and Sale Agreement was executed, as it did not receive notice of the same until several months after it closed on the Premises.

51.   Seneca intended for Selkey Buhl to rely on its representations in order for Selkey Buhl to execute the Purchase and Sale Agreement for the Premises and close the transaction.

*Verified Complaint and Demand for Jury Trial - Page 9 of 17*

52.  Selkey Buhl actually relied on Seneca's representation, and subsequently purchased the Premises based on Seneca's representations in the Purchase and Sale Agreement and the Bill of Sale.

53.  Selkey Buhl's reliance on Seneca's representations was justified and reasonable under all of the circumstances.

54.  Selkey Buhl has suffered damages caused by its reliance on Seneca's false representations.

55.  Specifically, Selkey Buhl is apparently obligated to buy out the Idaho Power Facilities, in the approximate amount of $649,599.00.

## CLAIM FOR PREJUDGMENT INTEREST

56.  Pursuant to an agreement between the parties or applicable law, Selkey Buhl is entitled to prejudgment interest on its damages alleged herein.

## RESERVATION OF MOTION FOR ADDITIONAL DAMAGES

57.  Selkey Buhl specifically reserves the right to submit a motion for an award of additional damages pursuant to IDAHO CODE § 6-1604.

## ATTORNEY FEES AND COURT COSTS

58.  Selkey Buhl has been required to retain the attorney services of Sawtooth Law Offices, PLLC, in order to prosecute and maintain this action.

59.  Selkey Buhl is entitled to an award of court costs incurred herein, pursuant to agreement of the parties, IDAHO CODE § 12-101, and/or Rule 54(d) of the FEDERAL RULES OF CIVIL PROCEDURE.

60.  Selkey Buhl is entitled to an award of reasonable litigation expenses and attorney fees incurred herein, pursuant to agreement of the parties, IDAHO CODE §§ 12-120 and/or 12-121, and/or Rule 54(e) of the FEDERAL RULES OF CIVIL PROCEDURE.

### DEMAND FOR JURY TRIAL

61.  Selkey Buhl hereby makes **DEMAND** for a jury trial of all matters contested herein and Selkey Buhl does not consent to any panel of jurors consisting of fewer than twelve (12) members.

**WHEREFORE**, Selkey Buhl **PRAYS** that the Court enter its decree, judgment, or order providing Selkey Buhl with the following relief:

A.    For an award of nominal, special and general damages payable to Selkey Buhl by Seneca in an amount to be proven at trial, alleged to be in excess of $649,599.00, exclusive of interest and costs; and

B.    For an award of Selkey Buhl's court costs, attorney fees, and litigation expenses incurred herein, payable by Seneca; and

C.    For an award to Selkey Buhl of all damages permitted by federal or Idaho law under the circumstances; and

D.    For such other and further relief as the Court deems just and appropriate under the circumstances.

**DATED** this 19th day of May, 2020.

SAWTOOTH LAW OFFICES, PLLC

by:_____
David P. Claiborne

*Verified Complaint and Demand for Jury Trial - Page 11 of 17*

## VERIFICATION

STATE OF _Wisconsin_ )
                           ) ss.
COUNTY OF _Sheboygan_ )

     Ray Selk, a member of Selkey Buhl, LLC, the Plaintiff in this action, being sworn, having read the foregoing, says that the facts set forth herein are true, accurate, and complete to the best of his knowledge and belief.

_____
Ray Selk

**SUBSCRIBED AND SWORN** to before me this _18_ day of May, 2020.

```
┌─────────────────────────┐
│     KAREN J SCHMITZ      │
│      Notary Public       │
│   State of Wisconsin     │
└─────────────────────────┘
```

_Karen Schmitz_
NOTARY PUBLIC
Residing at _Wisconsin_
My commission expires _3·13·2023_

**EXHIBIT A**

**WARRANTY DEED**



**TitleOne**
a title & escrow co.

**TWIN FALLS COUNTY**
RECORDED FOR:
TITLEONE BOISE
02:51:21 PM  08-31-2018
**2018013808**
NO. PAGES 6        FEE: $15.00
KRISTINA GLASCOCK
COUNTY CLERK
DEPUTY: BH
Electronically Recorded  by Simplifile

Order Number: 18313655   *PH /SD*

## WARRANTY DEED

For Value Received,

Seneca Foods Corporation, a New York Corporation, the Grantor, does hereby grant, bargain sell and convey unto, Selkey Buhl, LLC, a Wisconsin limited liability company, whose current address is  323 S. Main St., Cedar Grove, WI 53013-1611, the Grantee, the following described premises, in Twin Falls County, Idaho, To Wit:

PARCEL 1

TOWNSHIP 9 SOUTH, RANGE 15 EAST OF THE BOISE MERIDIAN, TWIN FALLS COUNTY, IDAHO

Section 31: A parcel of land located in the SW¼, being more particularly described as follows:

Commencing at the West One Quarter (W¼) corner of said Section 31, from which the Southwest corner of Section 31 bears South 00°37'00" East, 2650.92 feet;
Thence from the West One Quarter (W¼) corner of Section 31 on a bearing of South 89°54'55" East along the North boundary of the SW¼ of Section 31 for a distance of 902.10 feet to THE TRUE POINT OF BEGINNING;
Thence continuing South 89°54'55" East along the North boundary of the SW¼ of Section 31 for a distance of 31.80 feet;
Thence South 00°24'45" East for a distance of 340.27 feet;
Thence South 89°54'55" East parallel with the North boundary of the SW¼ of Section 31 for a distance of 317.55 feet;
Thence North 00°26'30" East for a distance of 340.26 feet to a point on the North boundary of the SW¼ of Section 31;
Thence South 89°54'55" East along the North boundary of the SW¼ of Section 31 for a distance of 146.39 feet;
Thence South 00°47'55" East for a distance of 688.95 feet;
Thence South 84°43'55" East for a distance of 261.53 feet;
Thence South 17°35'55" East for a distance of 292.39 feet;
Thence South 06°15'26" West for a distance of 281.85 feet;
Thence South 83°44'34" East for a distance of 124.64 feet;
Thence South 17°35'55" East for a distance of 74.18 feet to a point on the North right of way boundary of the Eastern Idaho Railroad;

Warranty Deed
Page 1 of 6

Thence North 83°52'00" West along the North right of way boundary of the Eastern Idaho Railroad for a distance of 986.70 feet to the point of curvature of a curve left;

Thence Northwesterly along the North right of way boundary of the Eastern Idaho Railroad and along the arc of the curve left for a distance of 110.97 feet, said arc having a radius of 6925.58 feet and a chord bearing and distance of North 84°19'33" West, 110.97 feet;

Thence North 00°40'12" East for a distance of 205.98 feet;

Thence North 07°43'29" East for a distance of 389.10 feet;

Thence South 84°59'42" East for a distance of 69.23 feet;

Thence North 00°37'00" West parallel with the West boundary of the SW¼ of Section 31 for a distance of 654.95 feet to THE TRUE POINT OF BEGINNING.

TOGETHER WITH AND SUBJECT TO:

1. An access and utility easement, said easement being on, over, under and across a strip of land that is encompassed by the following described boundary:

Commencing at the West One Quarter (W¼) corner of Section 31;

Thence South 89°54'55" East along the North boundary of the SW¼ of Section 31 for a distance of 902.10 feet;

Thence South 00°37'00" East parallel with the West boundary of the SW¼ of Section 31 for a distance of 25.00 feet to a point on the South easement boundary of a county road and being THE TRUE POINT OF BEGINNING;

Thence continuing South 00°37'00" East parallel with the West boundary of the SW¼ of Section 31 for a distance of 629.95 feet;

Thence North 84°59'42" West for a distance of 69.23 feet;

Thence South 07°43'29" West along the West boundary of the before described parcel for a distance of 128.54 feet;

Thence South 89°20'54" East for a distance of 118.16 feet;

Thence North 00°37'00" West parallel with the West boundary of the SW¼ of Section 31 for a distance of 437.31 feet;

Thence North 00°24'45" West for a distance of 315.27 feet to a point on the South easement boundary of a county road;

Thence North 89°54'55" West along the South easement boundary of the county road for a distance of 31.71 feet to THE TRUE POINT OF BEGINNING.

AND

SUBJECT TO:

1. A 25.0 foot wide county road easement along the most North boundary of the before described parcel.

2. An easement to the Twin Falls Canal Company for the use and maintenance of the irrigation lateral that traverses through the described parcel.

3. All other easements and rights-of-way of record.

PARCEL 2

TOWNSHIP 9 SOUTH, RANGE 15 EAST OF THE BOISE MERIDIAN, TWIN FALLS COUNTY, IDAHO

Section 31: A parcel of land located in the NE¼SW¼, being more particularly described as follows:

Commencing at the West One Quarter (W¼) corner of said Section 31, from which the Southwest corner of Section 31 bears South 00°37'00" East, 2650.92 feet;

Thence from the West One Quarter (W¼) corner of Section 31 on a bearing of South 89°54'55" East along the North boundary of the NW¼ of Section 31 for a distance of 1402.91 feet;

Thence South 00°47'55" East for a distance of 688.95 feet;

Thence South 84°43'55" East for a distance of 261.53 feet;

Thence South 17°35'55" East for a distance of 292.39 feet to THE TRUE POINT OF BEGINNING;

Thence North 06°15'26" East for a distance of 38.15 feet;

Thence South 83°44'34" East for a distance of 239.08 feet;

Thence North 06°15'26" East for a distance of 30.00 feet;

Thence South 83°44'34" East for a distance of 82.00 feet;

Thence South 06°15'26" West for a distance of 350.00 feet;

Thence North 83°44'34" West for a distance of 321.08 feet;

Thence North 06°15'26" East for a distance of 281.85 feet to THE TRUE POINT OF BEGINNING.

AND

SUBJECT TO:

1. All easements and rights-of-way of record.

PARCEL 3

TOWNSHIP 9 SOUTH, RANGE 15 EAST OF THE BOSIE MERIDIAN, TWIN FALLS COUNTY, IDAHO

Section 31: A parcel of land located in the S½, being more particularly described as follows:

Commencing at the West One Quarter (W¼) corner of said Section 31, from which the Southwest corner of Section 31 bears South 00°37'00" East, 2650.92 feet;

Thence from the West One Quarter (W¼) corner of Section 31 on a bearing of South 89°54'55" East along the North boundary of the NW¼ of Section 31 for a distance of 1402.91 feet to THE TRUE POINT OF BEGINNING;

Thence continuing South 89°54'55" East along the North boundary of the S½ of Section 31 for a distance of 1365.59 feet;

Thence South 00°50'20" East for a distance of 1452.81 feet to a point on the North right of way boundary of the Eastern Idaho Railroad;

Thence North 83°50'05" West along the North right of way boundary of the Eastern Idaho Railroad for a distance of 918.14 feet;

Thence departing the Eastern Idaho Railroad right of way on a bearing of North 17°35'55" West for a distance of 74.18 feet;

Thence South 83°44'34" East for a distance of 196.44 feet;

Thence North 06°15'26" East for a distance of 350.00 feet;

Thence North 83°44'34" West for a distance of 82.00 feet;

Thence South 06°15'26" West for a distance of 30.00 feet;

Thence North 83°44'34" West for a distance of 239.08 feet;

Thence South 06°15'26" West for a distance of 38.15 feet;

Thence North 17°35'55" West for a distance of 292.39 feet;

Thence North 84°43'55" West for a distance of 261.53 feet;

Thence North 00°47'55" West for a distance of 688.95 feet to THE TRUE POINT OF BEGINNING.

AND

SUBJECT TO:

1. A 25.0 foot wide county road easement along the North boundary of the before described parcel.

2. All easements and rights-of-way of record.

PARCEL 4

TOWNSHIP 9 SOUTH, RANGE 15 EAST OF THE BOISE MERIDIAN, TWIN FALLS COUNTY, IDAHO

Section 31: A parcel of land located in the SE¼, being more particularly described as follows:

Commencing at the West One Quarter (W¼) corner of said Section 31, from which the Southwest corner of Section 31 bears South 00°37'00" East, 2650.92 feet;
Thence from the West One Quarter (W¼) corner of Section 31 on a bearing of South 89°54'55" East along the North boundary of the S½ of Section 31 for a distance of 2768.50 feet to a point on the North boundary of the SE¼ of Section 31;
Thence South 00°50'20" East for a distance of 226.80 feet to THE TRUE POINT OF BEGINNING;
Thence South 89°54'55" East parallel with the North boundary of the SE¼ of Section 31 for a distance of 530.36 feet;
Thence South 00°49'16" East for a distance of 50.57 feet;
Thence South 89°54'55" East parallel with the North boundary of the SE¼ of Section 31 for a distance of 266.14 feet;
Thence South 00°44'30" East for a distance of 1260.17 feet to a point on the North right of way boundary of the Eastern Idaho Railroad;
Thence North 83°50'05" West along the North right of way boundary of the Eastern Idaho Railroad for a distance of 800.22 feet;
Thence North 00°50'20" West for a distance of 1226.01 feet to THE TRUE POINT OF BEGINNING.

AND SUBJECT TO:

1. All easements and rights-of-way of record.

PARCEL 5

TOWNSHIP 9 SOUTH, RANGE 15 EAST OF THE BOISE MERIDIAN, TWIN FALLS COUNTY, IDAHO

Section 31: A parcel of land in the S½ of said Section 31, being a part of a parcel of land described as Parcel 1 in a Warranty Deed between the Pillsbury Company (Grantor) and Seneca Foods Corporation (Grantee), recorded in the Twin Falls County Recorder's Office on December 23, 1995 as Instrument No. 1995002758, said part being described as follows:

Commencing at a ½ inch steel pin with an illegible plastic cap marking the S¼ corner of said Section 31, being also THE POINT OF BEGINNING of this land description;
Thence along the South line of the SE¼ of said Section 31, South 89°26'02" East (South 0°57' East), a distance of 44.67 feet to a point from which a ½ inch rebar with a plastic cap imprinted PLS 9858 bears North 00°03'16" West at a distance of 25.0 feet;
Thence North 00°03'16" West (North 0°32' West, Record), a distance of 565.00 feet to a ½ inch steel pin;
Thence South 89°26'02" East, a distance of 206.49 feet (South 89°57' East, 195.00 feet, Record), to a point at the center of Twin Falls Irrigation District Lateral "J", being also the beginning of a curve concave to the Northeast having a radius of 56.00 feet, a central angle of 27°19'20" and being subtended by a chord which bears South 23°55'01" East 26.45 feet, from which point a ½ inch steel pin with a plastic cap imprinted "PLS 9858" bears North 89°26'02" West at a distance of 10.9 feet;
Thence along the center of said lateral, and Southerly and Southeasterly along said curve to the left, a distance of 26.73 feet (South 52°56' East, 31.56 feet, Record) to a point of cusp, from which point a

Warranty Deed
Page 4 of 6

½ inch rebar with a plastic cap imprinted "PLS 9858" bears North 00°14'58" East at a distance of 9.6 feet;

Thence North 00°14'58" East, a distance of 554.53 feet (North 0°32' West, 549.75 feet, Record) to a ½ inch steel pin marking the intersection with the Southerly right of way line of a railroad;

Thence along said Southerly right of way line, North 83°21'12" West (North 83°52' West), a distance of 1194.40 feet to a point in the center of a Twin Falls Canal Company irrigation ditch, from which point a ½ inch rebar with a plastic cap imprinted "PLS-9858" bears North 83°21'12" West at a distance of 31.27 feet, and also from which point a ½ inch rebar with a plastic cap imprinted "PLS-9858" bears South 83°21'12" East at a distance of 18.2 feet;

Thence along the center of said ditch the following meandered bearings and distances:

South 28°49'59" East, a distance of 69.00 feet;
Thence South 12°29'37" East, a distance of 56.99 feet;
Thence South 06°06'22" East, a distance of 53.23 feet;
Thence South 16°57'19" East, a distance of 42.21 feet;
Thence South 06°10'13" East, a distance of 36.65 feet;
Thence South 36°19'30" East, a distance of 49.03 feet;
Thence South 20°00'24" East, a distance of 41.66 feet;
Thence South 37°27'04" East, a distance of 41.23 feet;
Thence South 28°30'06" East, a distance of 130.63 feet;
Thence South 12°27'34" East, a distance of 94.59 feet;
Thence South 05°17'24" East, a distance of 72.38 feet;
Thence South 02°28'50" East, a distance of 74.01 feet;
Thence South 16°38'55" East, a distance of 86.65 feet;
Thence South 01°49'21" West, a distance of 58.76 feet;
Thence South 15°42'31" East, a distance of 53.24 feet;
Thence South 28°35'16" East, a distance of 54.11 feet;
Thence South 28°40'04" East, a distance of 56.25 feet to a point being 225.07 feet Northerly from the South line of the S½ of said Section 31, from which point a ½ inch steel pin with a plastic cap imprinted "PLS 1000" bears South 89°27'08" East at a distance of 19.9 feet, and from which point a ½ inch rebar with a plastic cap imprinted "PLS 9858" bears North 89°27'08" West at a distance of 7.8 feet;

Thence a line parallel with and 225.07 feet distant from the South line of the SW¼ of said Section 31, South 89°27'08" East, (South 89°57' East, Record), a distance of 604.87 feet to a ½ inch rebar with a plastic cap imprinted "PLS 9858";

Thence South 00°14'58" West, a distance of 225.08 feet (South 0°32' East, 225.00 feet, Record) to THE POINT OF BEGINNING.

TO HAVE AND TO HOLD the said premises, with their appurtenances unto the said Grantee, its heirs and assigns forever.  And the said Grantor does hereby covenant to and with the said Grantee, that Grantor is the owner in fee simple of said premises; that they are free from all encumbrances EXCEPT those to which this conveyance is expressly made subject and those made, suffered or done by the Grantee; and subject to all existing patent reservations, easements, right(s) of way, protective covenants, zoning ordinances, and applicable building codes, laws and regulations, general taxes and assessments, including irrigation and utility assessments (if any) for the current year, which are not due and payable, and that Grantor will warrant and defend the same from all lawful claims whatsoever.  Whenever the context so requires, the singular number includes the plural.

Dated: August 29, 2018

Warranty Deed
Page 5 of 6

Seneca Foods Corporation, a New York Corporation

By: _____

    Aaron M. Girard
    Senior Vice President
    Logistics and Frozen


State of _WISCONSIN_, County of _ROCK_____, ss.

On this _29th_ day of _August_____ in the year of 2018, before me, the undersigned, a Notary Public in and for said State, personally appeared Aaron M. Girard, known or identified to me to be the Senior Vice President-Logistics and Frozen of the corporation that executed the instrument or the person who executed the instrument on behalf of said corporation, and acknowledged to me that such corporation executed the same.

_____
Notary Public
Residing In: _ROCK COUNTY, WISCONSIN_
My Commission Expires: _Permanent_
    /s
(seal)

JOHN D. EXNER
NOTARY PUBLIC

**EXHIBIT B**

**EXECUTED PURCHASE AND SALE AGREEMENT**

# Purchase and Sale Agreement
## *Seneca Foods Corporation and Selkey Buhl*
### August 3, 2018

1.  Selkey Buhl, LLC, hereinafter called ("Buyer") agrees to purchase and Seneca Foods Corporation hereinafter called ("Seller") agrees to sell the following described real estate hereinafter referred to as ("Property").

2.  PROPERTY ADDRESS AND LEGAL DESCRIPTION. The Property commonly known as the East portion of 430 7th Avenue South, City of Buhl, County of Twin Falls, State of Idaho, improved with 223,949 ± square feet of frozen cold storage space, 8,000 ± square feet of dry storage space, and 112,015 ± square feet of cold storage situated on 99 ± acres of land, and legally described as set forth in the attached Exhibit A. Buyer and Seller authorize the Escrow Agent (as such term is defined in Section 3) to make corrections to the legal description at their request.

3.  EARNEST MONEY.

    (i)   Within five (5) business days of mutual execution of this Agreement, Buyer shall deposit Seventy-Five Thousand and NO/100 Dollars ($75,000.00) in the form of cash (the "Earnest Money Deposit") as earnest money with TitleOne Corporation, 237 N. Lincoln, P.O. Box 349, Jerome, Idaho 83338, Attention: Laury Lamb, (208) 324-3357, llamb@titleonecorp.com, Attention: Scott Darling, (208) 287-5300, sdarling@titleonecorp.com, ("Escrow Agent"). (the "Title Company" and/or "Escrow Agent" as applicable). Subject only to the Buyer's Conditions Precedent set forth in Section 6 of this Agreement, and absent Seller's breach or inability to perform, the Earnest Money Deposit is non-refundable but such Earnest Money Deposit and the accumulated interest thereon shall be applied against the Purchase Price at closing and refunded to Buyer only in the event this Agreement is terminated as a result of the Seller's breach hereunder or if Buyer's Conditions Precedent are not satisfied in Buyer's sole and complete discretion. In the event this Agreement is terminated after Buyer's Conditions Precedent have been waived or satisfied, or the sale fails to close, by reason of a breach by Buyer, The Earnest Money Deposit shall be paid to Seller.

    (ii)  Earnest Money Deposit shall be deposited with the Escrow Agent ("Scott Darling and/or Laury Lamb") and shall be held in trust in accordance with the terms and conditions of this Agreement.

4.  PRICE/TERMS/ESCROW. Total Purchase Price is Nine Million Seven Hundred Thousand and NO/100 Dollars ($9,700,000.00).

    (i)   $ 75,000.00 Earnest Money Deposit

    (ii)  $ 9,625,000.00 Balance of the purchase price to be paid as follows:

PLP
**Buyer Initials**

RS
**Seller Initials**

[9,625,000.00] In cash at Closing

Escrow for Separation of Utilities: The Seller previously sold property adjoining the Property to Mason & Cornie Holdings, LLC ("MCLLC"), consisting of a warehouse (which shares a wall with buildings on the Property) and additional property to the southwest of the Property(the agricultural buildings to the northwest of the Property are not included for the purposes herein this paragraph), ("MC Property") in which certain utilities that are shared or common with the Property and the MC Property need to and have been agreed to be separated by the parties and paid on an equal 50/50 basis. As such, funds shall be withheld from the Purchase Price for Buyer to pay the portion of the separation expenses per the agreement Seller has with MCLLC, if such expenses have not been paid by Seller prior to Closing, as follows:

  a.  Power; Separation bid from Idaho Power was $16,000, assuming the real cost are going to be a little higher, estimated to be $20,000, so therefore Seneca will put $10,000 into escrow for power separation expenses post-closing.

  b.  Gas: Seneca will put $17,068 into escrow to cover the cost of replacing the gas lines by Intermountain Gas, or other suitable contractor, as well as the cost of a standard size gas meter. If Buyer chooses to have a larger meter installed, the additional costs will be the responsibility of Buyer.

  c.  Domestic Water: Seneca expects a bid for domestic water separation to be forthcoming within ten (10) days of the signing of this Agreement. Seneca will agree to put into escrow 50% of a reasonable bid amount.

  d.  Sewer: No funds shall be withheld for Escrow for any sewer separation or municipal sewer bond payment amounts due or for future payments of any kind. Buyer shall be responsible for all costs associated with sewer issues or concerns.

  e.  Phone: No funds shall be withheld for Escrow for any phone system separation or installation. Buyer shall be responsible for all costs associated with phone line and phone separation or installation issues or concerns. Seller is taking its phone system with them when they vacate the Property.

5.  INCLUDED ITEMS. All easement rights, mineral rights, other appurtenances, water and water rights appurtenant to or used on the Property including, but not limited to, any right Seller may have to receive natural flow and/or stored water delivered through any ditch, canal or water company's facilities, or under entitlements held by a third party for use on the Property, and all shares, certificates, and other documents evidencing such ground water and/or surface water rights.

Other items specifically included in this sale: All equipment and personal property currently located on the property and more fully described in the attached Exhibit E Notwithstanding the foregoing the following items of personal property are excluded from this transaction:

*Items specifically excluded from this sale:* Freezer tunnel that is located in the southern most portion of the building and the associated equipment for the freezer tunnel. Also excluded is the In-Feed Shaker, Control Panel, Reyco Water vac on the tunnel, LPR package. (Pictures of these items are attached in Exhibit D: phone system and phones.

Buyer Initials     Seller Initials

6.    ADDITIONAL TERMS, CONDITIONS, AND CONTINGENCIES. The date upon which all conditions and contingencies must either be satisfied or waived shall be 30 days from mutual execution of this Agreement, (the "Satisfaction Date").

    6.1    BUYER CONDITIONS:  The closing of this transaction is contingent upon satisfaction or waiver by Buyer of the following conditions:

        Inspection: Upon mutual execution of this Purchase Agreement Buyer shall be given full opportunity to inspect and investigate and to accept to Buyer's satisfaction, each and every aspect of the Property independently or through agent(s) of Buyer including, but without limitation with regard to:

          i.    All matters relating to title;

          ii.    Buyer shall have a Phase 1 performed on the Property and will review the results;

          iii.    Approval of financing upon terms and conditions suitable to Buyer;

          iv.    Due Diligence Materials as identified and requested by Buyer within Exhibit B to be reviewed and approved of by Buyer in its sole and complete discretion. All documents identified and/or to be requested shall be provided within Seven days of any written request.

          ~~v. Resolution of the City of Buhl, Idaho Waster Water Bond Fee amount assessed in the approximate amount of $548,000. Said amount was incurred as a municipal bond and financed capital improvements to the City of Buhl's waste water treatment facility directly related to Seller's waste water discharges.~~

          <u>v.</u>    ~~vi.~~ Issuance of a Certificate of Compliance with all zoning regulations from both the City of Buhl, Idaho and Twin Falls County, Idaho.

          vi.    ~~vii.~~ Executed Common Wall/ Roof Agreement between ~~Seneca and relevant parties on Parcel 1. viii. Assignment of fencing requirement between Parcel 1 and the Parcels to the west~~ Seller and MC LLC regarding the MC Property and the Property.

          vii.    ~~ix.~~ Fire Suppression Agreement already executed between ~~necessary parties~~ Seller and MC LLC to be recorded.

If any of the foregoing conditions remain unsatisfied and unwaived by Buyer on the Satisfaction Date this Agreement shall terminate, provided Buyer has given written notice of such unsatisfied and unwaived conditions to Seller by the Satisfaction Date, and the Earnest Money shall be returned to Buyer.  Failure of Buyer to give written notice to Seller of unsatisfied conditions by the Satisfaction Date shall be deemed to be waiver by Buyer of all such conditions.

_____
Buyer Initials       Seller Initials

7.   TITLE COMPANY/ESCROW AGENT.  The parties agree that the TITLE COMPANY/Escrow Agent as defined in Section 3, shall provide any required title policy and preliminary report or commitment.   Each party agrees to pay one-half of the Escrow Agents fee.

8.   ESTOPPEL CERTIFICATE(S) and SNDA(S).      NA

9.   BUYER/SELLER Licensed Real Estate Disclosure.      NA

10.  TITLE INSURANCE.  Seller shall provide and pay for an ~~ALTA  Owner's standard  survey~~ *and* Purchaser's Standard Coverage Title Policy insuring the Buyer for the amount of the purchase price.  Extended coverage required [ ]Yes [✓]No.  ~~Additional premiums for extended coverage and any survey required by the Title Company shall be paid by Seller.~~Seller shall perform and pay for the new survey, as well as the recording of the new legal description. Buyer to approve new property lines. Buyer shall pay all expenses and costs of the ALTA survey being performed by Trevor Reno as part of the Buyer's financing.  Seller shall cause the Title Company to provide Buyer with a preliminary title report or commitment together with copies of all underlying documents giving rise to any exceptions listed therein within five (5) business days of mutual execution of this Agreement.

Buyer shall have ten (10) days from receipt of the preliminary title report or commitment to object, by written notice to Seller, to the condition of title as set forth in the report.  In the event the Buyer makes written objection to any exception to title, Seller shall have a reasonable time, not to exceed  five (5) days, to remove any such objection to exception or provide affirmative title insurance coverage, and in the event the Seller cannot remove, or is unwilling to remove, such objected to exceptions or provide affirmative title insurance coverage, the Buyer may elect, as its sole remedy, to (a) either terminate this Agreement or (b) proceed to closing, taking title subject to such exceptions.  If the Buyer does not object within the time frame set out above, the Buyer shall be deemed to have accepted the condition of the title.  In the event Buyer elects to terminate this Agreement as provided herein, the Buyer shall be entitled to the return of all refundable deposits made by Buyer.  The final title insurance policy shall be delivered to the Buyer by the Title Company as soon as possible after Closing.

11.  CLOSING DATE.  On or before "Closing" ("Closing") shall be deemed to be the date on which the deed is recorded and the sales proceeds are available for disbursement to Seller and as otherwise directed by the parties. Buyer and Seller shall deposit with the Escrow Agent all funds and instruments necessary to complete the sale.  Closing shall occur no later than 15 calendar days after the Satisfaction Date.

12.  DOCUMENTS TO BE DELIVERED AT CLOSING.  On the date of Closing, Seller shall have executed, or caused to be executed, and delivered to the Closing Agent the following documents, if required by Buyer, in a form reasonably acceptable to Buyer and Seller:

    (a)   Warranty Deed
    (b)   FIRPTA

Buyer Initials          Seller Initials

(c)   An Assignment and assumption of all leases, warranties, contracts, and guarantees that effect the Property in a form mutually agreed to between the parties, (if applicable)

(d)   Bill of Sale for Sale for personal property items identified within Exhibit E

(e)   Any other instruments or documents reasonably requested by Buyer;

(f)   All stock water certificates of Twin Falls Canal Company related to the real property and identified as Certificate Number(s) 43658, 33542, 33431, and 33433;

(g)   Notice of Change in Water Right Ownership for ground water right number(s) 47-2330 and 47-11236;

13.   POSSESSION/PRORATION/CLOSING COSTS/POST CLOSING.   Buyer shall be entitled to possession on the day of Closing.   Taxes and water assessments (using the last available assessment as a basis), rents, insurance premiums, interest and reserves on obligations assumed and utilities shall be prorated as of Closing.   Any tenant deposits held by Seller shall be credited to Buyer at Closing.   All standard closing costs shall be shared by Buyer and Seller on a 50/50 basis, except the cost of an ALTA Standard Coverage Title Insurance policy as outlined in section 10 above and brokerage commissions outlined in section 24 below.

Provided Closing occurs prior the date rents are due, and provided further that Seller receives the lease payments for the second half of the Koch and Irish Farm leases as scheduled in November 2018, Seneca will promptly distribute those funds associated with the currently Seneca-owned property for the two leases (i.e. $2,250 for the Koch lease south of the rail line, and $6,325 (46 acres x $275 / 2 payments) for the Irish lease).

14.   ACCEPTANCE.   This offer is made subject to the acceptance of Buyer on or before 12:00 o'clock midnight of 11 AM on August XXX 11, 2018.

15.   DEFAULT.   If Seller executes this Agreement and title to the Property is marketable and insurable in the conditions approved under Section 6 hereof and all Buyer's contingencies have been removed or waived, and Buyer neglects or refuses to comply with the terms of or any condition of sale by the date on which such term or condition is to be complied with, then the Earnest Money Deposit shall be forfeited to Seller and Buyer's interest in the Property shall be immediately terminated.   Such forfeiture and acceptance by Seller of the Earnest Money Deposit does not constitute a waiver or election of other remedies available to Seller and Seller shall have the right, at his option, to bring any action at law or equity to enforce the term of this contract or seek restitution for damages including any unpaid brokerage fee.   In the event of default by either of the parties in their performance of the terms or conditions of this Agreement, the defaulting party agrees to pay all attorney fees and costs incurred by the non-defaulting party and in the event of suit the prevailing party shall be entitled to its reasonable attorney fees and costs.

In the event of a dispute between the parties as to the Earnest Money Deposit deposited hereunder by Buyer, the Escrow Agent holding the Earnest Money Deposit may file an interpleader action in a court of competent jurisdiction to resolve any dispute between the parties.

Buyer Initials          Seller Initials

The Buyer and Seller authorize the Escrow Agent holding the Earnest Money Deposit to utilize as much of the Earnest Money Deposit as may be necessary to advance the costs and fees required for filing of any such action. The cost of such action shall be paid by the Party which is not the prevailing party.

16. TITLE CONVEYANCE. Title to the Property is to be conveyed by Warranty deed and is to be marketable and insurable except for rights reserved in federal patents, building or use restriction, building and zoning regulations and ordinances of any governmental unit, rights of way and easements established or of record, and any other liens, encumbrances or defects approved by Buyer. In the event any personal property is included as part of the contemplated sale, it shall be conveyed by bill of sale and shall be free and clear of all liens, claims and encumbrances. Furthermore, any individual executing this Agreement and/or the documents identified within this section and/or any other documents necessary to complete the transactions identified herein; represents that they have the full legal authority to execute the above and legally bind the respective party for which they are executing the same.

17. RISK OF LOSS. Seller shall keep the Property insured against loss by fire and other casualty usually insured against in the market area of the Property until the Closing. Should the Property be materially damaged by fire or other cause prior to closing and such damage is ten percent (10%) of the Purchase Price or less, then Seller shall pay or assign the proceeds of the insurance to Buyer (and pay to Buyer the amount of any deductible in cash) at Closing and Seller and Buyer shall proceed with Closing without adjustment to the Purchase Price. If such damage exceeds ten percent (10%) of the Purchase Price, then this Agreement shall be voidable at the option of the Buyer by written notice to Seller within ten (10) days of the date Buyer receives notice of such damage, however, Buyer may elect to proceed with Closing without adjustment to the Purchase Price (either by written notice of such election or by failure to timely send written notice of the voiding of this Agreement as provided above) and Seller shall pay or assign the proceeds of the insurance to Buyer (and pay to Buyer the amount of any deductible in cash) at Closing.

18. CONDEMNATION. Should any entity having the power of condemnation decide prior to Closing to acquire any portion of, or interest in, the Property with a value of ten percent (10%) or less of the Purchase Price, Seller shall pay or assign the proceeds of the taking to Buyer at Closing and Seller and Buyer shall proceed with Closing without adjustment to the Purchase Price. If such taking exceeds ten percent (10%) of the Purchase Price, Buyer at Buyer's sole option may either (a) elect to terminate Buyer's obligation to purchase the Property by giving written notice to Seller at any time prior to Closing and Seller shall promptly return the Earnest Money Deposit or (b) elect to complete the purchase of Property and require Seller to immediately appoint Buyer as its attorney-in-fact to negotiate with said condemning entity, and, in such event, Buyer shall receive all sums awarded in such condemnation proceeding of the Property, excluding any amounts attributable to adverse impacts on other property owned by Seller. Seller hereby agrees to immediately give notice to Buyer of any condemnation or contemplated condemnation of the Property and Buyer hereby agrees to, within ten (10) days of such notice, give written notice to Seller of Buyer's election with respect thereto.

Buyer Initials          Seller Initials

19. CONDITION OF PROPERTY AT CLOSING. . Buyer agrees to purchase the Property in as is (existing) condition, where is, with all faults. Buyer will assume those obligations with respect to the Property as are expressly stated in Section 5. Buyer does not agree to assume any other obligations with respect to the Property except for those obligations stated in Section 5. Seller shall maintain the Property until the closing in its present condition, ordinary wear and tear excepted, subject to the provisions of Sections 17 and 18 on casualty and condemnation. Any oral or written information, reports, statements, documents, or records concerning the Property ("Disclosures") provided or made available to Buyer or its agents or constituents by Seller, Seller's agents, employees or third parties representing or purporting to represent Seller, shall not be representations or warranties, except as specifically provided for in this Agreement. In purchasing the Property or taking other action hereunder, Buyer has not and shall not rely on any disclosures, but rather, Buyer shall rely only on Buyer's own inspection of the Property. Buyer acknowledges that the purchase price reflects and takes into account that the Property is being sold "As Is".

20. INSPECTION. The Buyer hereby acknowledges further that Buyer is not relying upon any statement or representations by the Broker or Broker's representatives or by the Seller which are not herein expressed. The Buyer has entered into this Agreement relying upon information and knowledge obtained or to be obtained from Buyer's own investigation or personal inspection of the Property.

21. ADDITIONAL PROVISIONS. Additional provisions of this Agreement, if any, are attached hereto by an addendum consisting of one (1) page.

22. REPRESENTATION CONFIRMATION AND ACKNOWLEDGEMENT OF DISCLOSURE.

| Buyer's Brokerage: | Colliers Paragon, LLC |
| Buyer's Agent(s): | Devin Ogden |

| Seller's Brokerage: | Colliers Paragon, LLC |
| Seller's Agent(s): | Devin Ogden |

Check one (1) box in Section 1 below and one (1) box in Section 2 below to confirm that in this transaction, the brokerage(s) involved had the following relationship(s) with the BUYER(S) and SELLER(S).

Section 1:
A.  ☐ The brokerage working with the BUYER(S) is acting as an AGENT for the BUYER(S).
B.  ☐ The brokerage working with the BUYER(S) is acting as a LIMITED DUAL AGENT for the BUYER(S).
C.  ☐ The brokerage working with the BUYER(S) is acting as a LIMITED DUAL AGENT for the BUYER(S), and has an ASSIGNED AGENT acting solely on behalf of the BUYER(S).
D.  ☒ The brokerage working with the BUYER(S) is acting as a NONAGENT for the BUYER(S)

Buyer Initials          Seller Initials

Section 2:
A.  ☒ The brokerage working with the SELLER(S) is acting as an AGENT for the SELLER(S).
B.  ☐ The brokerage working with the SELLER(S) is acting as a LIMITED DUAL AGENT for the SELLER(S).
C.  ☐ The brokerage working with the SELLER(S) is acting as a LIMITED DUAL AGENT for the SELLER(S), and has an ASSIGNED AGENT acting solely on behalf of the SELLER(S)
D.  ☐ The brokerage working with the SELLER(S) is acting as a NONAGENT for the SELLER(S).

Each party signing this document confirms that he or she has received read and understood the Agency Disclosure Brochure, attached as Exhibit C, and has elected the relationship confirmed above. In addition, each party confirms that the brokers agency office policy was made available for inspection and review. EACH PARTY UNDERSTANDS THAT HE/SHE IS A "CUSTOMER" AND IS NOT REPRESENTED BY A BROKER UNLESS THERE IS A SIGNED WRITTEN AGREEMENT FOR AGENCY REPRESENTATION.

23.  RESPONSIBLE BROKER. The Responsible Broker in this transaction is George Iliff, Designated Broker for Colliers Paragon, LLC.

24.  COMMISSION. The only brokerage company involved in this transaction is Colliers Paragon, LLC. A commission of Four (4%) of the selling price shall be paid to Colliers Paragon, LLC. Commission shall be paid out of the first monies received by Seller at the time of Closing. Buyer has no obligation relating to this compensation.

25.  ESCROW INSTRUCTIONS. The Escrow Agent is instructed to, in a manner consistent with the terms hereof: receive and hold deposits and other funds; disburse such funds in accordance with separate authorization signed by Buyer and Seller; prepare closing statements for execution by Buyer and Seller; receive documents, secure their execution and acknowledgement, record them in the proper sequence, deliver originals to the appropriate parties, and deliver copies of all documents signed by either party to that party. If a dispute arises regarding any funds held by the closing agent, such agent shall have no obligation to resolve such dispute but shall hold the same pending resolution of such dispute, and may at its option bring an action in interpleader.

26.  GOVERNING LAW. This Agreement shall be governed by the laws of the State of Idaho.

27.  TAX-DEFERRED EXCHANGE.  Tax-Deferred Exchange. Buyer and Seller agree that, at either Buyer's or Seller's sole election, this transaction shall be structured as an exchange of like-kind properties under Section 1031 of the Internal Revenue Code of 1986, as amended (the "Code"), and the regulations and proposed regulations thereunder. The parties agree that if either wishes to make such election, it must do so prior to the date of closing. If either so elects, the other shall reasonably cooperate, provided any such exchange is consummated pursuant to an agreement that is mutually acceptable to Buyer and Seller and which shall be executed and

Buyer Initials     Seller Initials

delivered on or before the date of closing. The electing party shall in all events be responsible for all costs and expenses related to the Section 1031 exchange and shall fully indemnify, defend and hold the other harmless from and against any and all liability, claims, damages, expenses (including reasonable attorneys' fees), proceedings and causes of action of any kind or nature whatsoever arising out of, connected with or in any manner related to such 1031 exchange that would not have been incurred by the non-electing party if the transaction were a purchase for cash. The provisions of the immediately preceding sentence shall survive closing and the transfer of title of the subject property to Buyer. Notwithstanding anything to the contrary contained in this Section, any such Section 1031 exchange shall be consummated through the use of a facilitator or intermediary so that Buyer shall in no event be requested or required to acquire title to any property other than the subject property

28.  IDAHO DEPARTMENT OF ENVIROMENTAL QUALITY REUSE PERMIT. Seller has previously obtained a Reuse Permit as identified as I-016-04. Seller has previously submitted a closure plan to the Idaho Department of Environmental Quality. Seller post-closing shall be obligated to comply with any and all terms and conditions imposed relating to the closure of this Reuse Permit and the financial costs associated with the same.

29.  TIME, SEVERABILITY. Time is of the essence of this Agreement, and each party hereto agrees to promptly perform such acts as are reasonably required in connection herewith. If any provision of this Agreement is found by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement shall not be affected thereby.

30.  NOTICES. All notices required hereunder shall be given in writing and shall be deemed effective (a) upon delivery, if delivered in person, or by electronic transmission with receipt acknowledged by the recipient thereof; (b) one business day after deposited for overnight delivery with any reputable overnight courier service; or (c) two business days after deposited with the US Postal Service registered or certified mail and addressed to the parties at the addresses set forth below.

31.  ENTIRE AGREEMENT - CONSTRUCTION. This Agreement constitutes the entire agreement between the parties, has been entered into in reliance solely on the contents hereof, and supersedes any previous agreements, written or oral, between the parties hereto. This Agreement shall not be modified except in writing signed by both parties. This Agreement shall be construed neutrally rather than strictly for or against either party.

32.  BUSINESS DAY. A business day is herein defined as Monday through Friday, 8:00 am to 5:00 pm in the local time zone where the Property is physically located. A business day shall not include any Saturday or Sunday, or legal holiday recognized by the State of Idaho as found in Idaho Code §73-108. The first day shall be the date of execution. If the last day is a legal holiday, the time for performance shall be the next subsequent business day.

Buyer Initials          Seller Initials

33.    CALENDAR DAY.  A calendar day is herein defined as Monday through Sunday, midnight to midnight, in the local time zone where the subject Property is physically located.  A calendar day shall include any legal holiday.  The first day shall be the date of execution.  Any reference to "day" or "days" in this Agreement means the same as a calendar day, unless specifically enumerated as a "business day".   If a calendar day in this Agreement falls on a Saturday or a Sunday, the time for performance shall be the next subsequent business day.

34.    BINDING  EFFECT – SURVIVAL.   This Agreement shall be binding upon the heirs, administrators, executors, successors and assigns of the parties hereto and shall survive the closing of this transaction.

35.    LEGAL REPRESENTATION.  The parties expressly acknowledge they have been represented by counsel of their own choice in connection with this Agreement and have discussed the terms of this Agreement with such counsel to the extent each party believes it to have been necessary to fully understand the terms hereof.  In entering into this Agreement, the parties represent and declare that each of them fully understands the terms and effect of this Agreement.

36.    TIME IS OF THE ESSENCE IN THIS AGREEMENT.

THIS IS A LEGALLY BINDING AGREEMENT.  PRIOR TO SIGNING THIS AGREEMENT, BUYER AND SELLER ARE ADVISED TO SEEK THE ADVICE OF COMPETENT LEGAL COUNSEL.  WRITTEN INFORMATION PROVIDED BY BROKER IS BELIEVED TO BE RELIABLE BUT INDEPENDENT VERIFICATION BY BUYER SHOULD BE UNDERTAKEN.

[END OF TEXT – SIGNATURES NEXT PAGE]

Buyer Initials     Seller Initials

IN WITNESS WHEREOF, Buyer and Seller have executed this Agreement as of the last signature date below.

| | | | |
|---|---|---|---|
| BUYER: | Selkey Buhl, LLC | SELLER: | Seneca Foods Corporation |
| By: | | By: | |
| Print Name: | RAY SELK | Print Name: | PAUL PALMBY |
| Its: | PRES. | Its: | EXECUTIVE VP & COO |
| Date: | 8/10/18 | Date: | 8-10-18 |
| Address: | 707 SOUTH COMMERCE ST. | Address: | 418 EAST CONDIE ST. |
| | CEDAR GROVE, W.I. 53013 | | JANESVILLE WI |
| Telephone: | 920-207-1114 | Telephone: | 608-757-6000 |

Buyer Initials

Seller Initials

STATE OF Wisconsin )
                        : ss.
County of Sheboygan )

On this 10 day of August , 2018, before me, a Notary Public in and for said state, personally appeared Ray Selk, the managing member of Selky Buhl, L.L.C., a Wisconsin limited liability company, and the person who executed the instrument on behalf of said limited liability company and acknowledged to me that such limited liability company executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

CHRISTINE PANNIER
NOTARY PUBLIC
STATE OF WISCONSIN

Christe mPannier
Notary Public for Idaho Wisconsin
Residing at: Sheboygan County, WI
My commission expires: 3-1-2022

STATE OF Wisconsin )
                        : ss.
County of Rock )

On this 10th day of August , 2018, before me, a Notary Public in and for said state, personally appeared Paul Palmby , the Exec VP and COO of Seneca Foods Corporation a New York Corporation, and the person who executed the instrument on behalf of said Corporation and acknowledged to me that such Corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

JOHN D. EXNER
NOTARY PUBLIC

John D Exner
Notary Public for Idaho Wisconsin
Residing at: Janesville, WI
My commission expires: is Permanent

PLP
Buyer Initials

RS
Seller Initials

**EXHIBIT A**
**LEGAL DESCRIPTION OF PROPERTY**

PARCEL NO. 1

TOWNSHIP 9 SOUTH, RANGE 15 EAST OF THE BOISE MERIDIAN, TWIN FALLS COUNTY, IDAHO

Section 31: A parcel of land in the S½ of said Section 31, being a part of a parcel of land described as Parcel 1 in a Warranty Deed between the Pillsbury Company (Grantor) and Seneca Foods Corporation (Grantee), recorded in the Twin Falls County Recorder's Office on December 23, 1995 as Instrument No. 1995002758, said part being described as follows:

Commencing at a ½ inch steel pin with an illegible plastic cap marking the S¼ corner of said Section 31, being also THE POINT OF BEGINNING of this land description;
Thence along the South line of the SE¼ of said Section 31, South 89°26'02" East (South 0°57' East), a distance of 44.67 feet to a point from which a ½ inch rebar with a plastic cap imprinted PLS 9858 bears North 00°03'16" West at a distance of 25.0 feet;
Thence North 00°03'16" West (North 0°32' West, Record), a distance of 565.00 feet to a ½ inch steel pin;
Thence South 89°26'02" East, a distance of 206.49 feet (South 89°57' East, 195.00 feet, Record), to a point at the center of Twin Falls Irrigation District Lateral "J", being also the beginning of a curve concave to the Northeast having a radius of 56.00 feet, a central angle of 27°19'20" and being subtended by a chord which bears South 23°55'01" East 26.45 feet, from which point a ½ inch steel pin with a plastic cap imprinted "PLS 9858" bears North 89°26'02" West at a distance of 10.9 feet;
Thence along the center of said lateral, and Southerly and Southeasterly along said curve to the left, a distance of 26.73 feet (South 52°56' East, 31.56 feet, Record) to a point of cusp, from which point a ½ inch rebar with a plastic cap imprinted "PLS 9858" bears North 00°14'58" East at a distance of 9.6 feet;
Thence North 00°14'58" East, a distance of 554.53 feet (North 0°32' West, 549.75 feet, Record) to a ½ inch steel pin marking the intersection with the Southerly right of way line of a railroad;
Thence along said Southerly right of way line, North 83°21'12" West (North 83°52' West), a distance of 1194.40 feet to a point in the center of a Twin Falls Canal Company irrigation ditch, from which point a ½ inch rebar with a plastic cap imprinted "PLS-9858" bears North 83°21'12" West at a distance of 31.27 feet, and also from which point a ½ inch rebar with a plastic cap imprinted "PLS-9858" bears South 83°21'12" East at a distance of 18.2 feet;
Thence along the center of said ditch the following meandered bearings and distances:
South 28°49'59" East, a distance of 69.00 feet;
Thence South 12°29'37" East, a distance of 56.99 feet;
Thence South 06°06'22" East, a distance of 53.23 feet;
Thence South 16°57'19" East, a distance of 42.21 feet;
Thence South 06°10'13" East, a distance of 36.65 feet;
Thence South 36°19'30" East, a distance of 49.03 feet;
Thence South 20°00'24" East, a distance of 41.66 feet;

Buyer Initials          Seller Initials

Thence South 37°27'04" East, a distance of 41.23 feet;
Thence South 28°30'06" East, a distance of 130.63 feet;
Thence South 12°27'34" East, a distance of 94.59 feet;
Thence South 05°17'24" East, a distance of 72.38 feet;
Thence South 02°28'50" East, a distance of 74.01 feet;
Thence South 16°38'55" East, a distance of 86.65 feet;
Thence South 01°49'21" West, a distance of 58.76 feet;
Thence South 15°42'31" East, a distance of 53.24 feet;
Thence South 28°35'16" East, a distance of 54.11 feet;
Thence South 28°40'04" East, a distance of 56.25 feet to a point being 225.07 feet Northerly from the South line of the S½ of said Section 31, from which point a ½ inch steel pin with a plastic cap imprinted "PLS 1000" bears South 89°27'08" East at a distance of 19.9 feet, and from which point a ½ inch rebar with a plastic cap imprinted "PLS 9858" bears North 89°27'08" West at a distance of 7.8 feet;
Thence a line parallel with and 225.07 feet distant from the South line of the SW¼ of said Section 31, South 89°27'08" East, (South 89°57' East, Record), a distance of 604.87 feet to a ½ inch rebar with a plastic cap imprinted "PLS 9858";
Thence South 00°14'58" West, a distance of 225.08 feet (South 0°32' East, 225.00 feet, Record) to THE POINT OF BEGINNING.

PARCEL NO. 2

TOWNSHIP 9 SOUTH, RANGE 15 EAST OF THE BOISE MERIDIAN, TWIN FALLS COUNTY, IDAHO

Section 31: A parcel of land located in the SE¼, being more particularly described as follows:

Commencing at the West One Quarter (W¼) corner of said Section 31, from which the Southwest corner of Section 31 bears South 00°37'00" East, 2650.92 feet;
Thence from the West One Quarter (W¼) corner of Section 31 on a bearing of South 89°54'55" East along the North boundary of the S½ of Section 31 for a distance of 2768.50 feet to a point on the North boundary of the SE¼ of Section 31;
Thence South 00°50'20" East for a distance of 226.80 feet to THE TRUE POINT OF BEGINNING;
Thence South 89°54'55" East parallel with the North boundary of the SE¼ of Section 31 for a distance of 530.36 feet;
Thence South 00°49'16" East for a distance of 50.57 feet;
Thence South 89°54'55" East parallel with the North boundary of the SE¼ of Section 31 for a distance of 266.14 feet;
Thence South 00°44'30" East for a distance of 1260.17 feet to a point on the North right of way boundary of the Eastern Idaho Railroad;
Thence North 83°50'05" West along the North right of way boundary of the Eastern Idaho Railroad for a distance of 800.22 feet;
Thence North 00°50'20" West for a distance of 1226.01 feet to THE TRUE POINT OF BEGINNING.

PARCEL NO. 3

Page 14 of 31

Buyer Initials          Seller Initials

TOWNSHIP 9 SOUTH, RANGE 15 EAST OF THE BOSIE MERIDIAN, TWIN FALLS COUNTY, IDAHO

Section 31: A parcel of land located in the S½, being more particularly described as follows:

Commencing at the West One Quarter (W¼) corner of said Section 31, from which the Southwest corner of Section 31 bears South 00°37'00" East, 2650.92 feet;
Thence from the West One Quarter (W¼) corner of Section 31 on a bearing of South 89°54'55" East along the North boundary of the NW¼ of Section 31 for a distance of 1402.91 feet to THE TRUE POINT OF BEGINNING;
Thence continuing South 89°54'55" East along the North boundary of the S½ of Section 31 for a distance of 1365.59 feet;
Thence South 00°50'20" East for a distance of 1452.81 feet to a point on the North right of way boundary of the Eastern Idaho Railroad;
Thence North 83°50'05" West along the North right of way boundary of the Eastern Idaho Railroad for a distance of 918.14 feet;
Thence departing the Eastern Idaho Railroad right of way on a bearing of North 17°35'55" West for a distance of 74.18 feet;
Thence South 83°44'34" East for a distance of 196.44 feet;
Thence North 06°15'26" East for a distance of 350.00 feet;
Thence North 83°44'34" West for a distance of 82.00 feet;
Thence South 06°15'26" West for a distance of 30.00 feet;
Thence North 83°44'34" West for a distance of 239.08 feet;
Thence South 06°15'26" West for a distance of 38.15 feet;
Thence North 17°35'55" West for a distance of 292.39 feet;
Thence North 84°43'55" West for a distance of 261.53 feet;
Thence North 00°47'55" West for a distance of 688.95 feet to THE TRUE POINT OF BEGINNING.

SUBJECT TO:
1. A 25.0 foot wide county road easement along the North boundary of the before described parcel.

PARCEL NO. 4

TOWNSHIP 9 SOUTH, RANGE 15 EAST OF THE BOISE MERIDIAN, TWIN FALLS COUNTY, IDAHO

Section 31: A parcel of land located in the NE¼SW¼, being more particularly described as follows:

Commencing at the West One Quarter (W¼) corner of said Section 31, from which the Southwest corner of Section 31 bears South 00°37'00" East, 2650.92 feet;
Thence from the West One Quarter (W¼) corner of Section 31 on a bearing of South 89°54'55" East along the North boundary of the NW¼ of Section 31 for a distance of 1402.91 feet;
Thence South 00°47'55" East for a distance of 688.95 feet;
Thence South 84°43'55" East for a distance of 261.53 feet;
Thence South 17°35'55" East for a distance of 292.39 feet to THE TRUE POINT OF BEGINNING;
Thence North 06°15'26" East for a distance of 38.15 feet;

Buyer Initials          Seller Initials

Thence South 83°44'34" East for a distance of 239.08 feet;
Thence North 06°15'26" East for a distance of 30.00 feet;
Thence South 83°44'34" East for a distance of 82.00 feet;
Thence South 06°15'26" West for a distance of 350.00 feet;
Thence North 83°44'34" West for a distance of 321.08 feet;
Thence North 06°15'26" East for a distance of 281.85 feet to THE TRUE POINT OF BEGINNING.

PARCEL NO. 5

TOWNSHIP 9 SOUTH, RANGE 15 EAST OF THE BOISE MERIDIAN, TWIN FALLS COUNTY, IDAHO

Section 31: A parcel of land located in the SW¼, being more particularly described as follows:

Commencing at the West One Quarter (W¼) corner of said Section 31, from which the Southwest corner of Section 31 bears South 00°37'00" East, 2650.92 feet;
Thence from the West One Quarter (W¼) corner of Section 31 on a bearing of South 89°54'55" East along the North boundary of the SW¼ of Section 31 for a distance of 902.10 feet to THE TRUE POINT OF BEGINNING;
Thence continuing South 89°54'55" East along the North boundary of the SW¼ of Section 31 for a distance of 31.80 feet;
Thence South 00°24'45" East for a distance of 340.27 feet;
Thence South 89°54'55" East parallel with the North boundary of the SW¼ of Section 31 for a distance of 317.55 feet;
Thence North 00°26'30" East for a distance of 340.26 feet to a point on the North boundary of the SW¼ of Section 31;
Thence South 89°54'55" East along the North boundary of the SW¼ of Section 31 for a distance of 146.39 feet;
Thence South 00°47'55" East for a distance of 688.95 feet;
Thence South 84°43'55" East for a distance of 261.53 feet;
Thence South 17°35'55" East for a distance of 292.39 feet;
Thence South 06°15'26" West for a distance of 281.85 feet;
Thence South 83°44'34" East for a distance of 124.64 feet;
Thence South 17°35'55" East for a distance of 74.18 feet to a point on the North right of way boundary of the Eastern Idaho Railroad;
Thence North 83°52'00" West along the North right of way boundary of the Eastern Idaho Railroad for a distance of 986.70 feet to the point of curvature of a curve left;
Thence Northwesterly along the North right of way boundary of the Eastern Idaho Railroad and along the arc of the curve left for a distance of 110.97 feet, said arc having a radius of 6925.58 feet and a chord bearing and distance of North 84°19'33" West, 110.97 feet;
Thence North 00°40'12" East for a distance of 205.98 feet;
Thence North 07°43'29" East for a distance of 389.10 feet;
Thence South 84°59'42" East for a distance of 69.23 feet;
Thence North 00°37'00" West parallel with the West boundary of the SW¼ of Section 31 for a distance of 654.95 feet to THE TRUE POINT OF BEGINNING.

Buyer Initials     Seller Initials

TOGETHER WITH AND SUBJECT TO:
1. An access and utility easement, said easement being on, over, under and across a strip of land that is encompassed by the following described boundary:

Commencing at the West One Quarter (W¼) corner of Section 31;
Thence South 89°54'55" East along the North boundary of the SW¼ of Section 31 for a distance of 902.10 feet;
Thence South 00°37'00" East parallel with the West boundary of the SW¼ of Section 31 for a distance of 25.00 feet to a point on the South easement boundary of a county road and being THE TRUE POINT OF BEGINNING;
Thence continuing South 00°37'00" East parallel with the West boundary of the SW¼ of Section 31 for a distance of 629.95 feet;
Thence North 84°59'42" West for a distance of 69.23 feet;
Thence South 07°43'29" West along the West boundary of the before described parcel for a distance of 128.54 feet;
Thence South 89°20'54" East for a distance of 118.16 feet;
Thence North 00°37'00" West parallel with the West boundary of the SW¼ of Section 31 for a distance of 437.31 feet;
Thence North 00°24'45" West for a distance of 315.27 feet to a point on the South easement boundary of a county road;
Thence North 89°54'55" West along the South easement boundary of the county road for a distance of 31.71 feet to THE TRUE POINT OF BEGINNING.

SUBJECT TO:
1. A 25.0 foot wide county road easement along the most North boundary of the before described parcel.
2. An easement to the Twin Falls Canal Company for the use and maintenance of the irrigation lateral that traverses through the described parcel.

Buyer Initials          Seller Initials

## EXHIBIT B
## DUE DILIGENCE MATERIALS

1. Any and all materials and/or communications related to any Bond Fee Agreement with the City of Buhl, Idaho relating to the waste water system;
2. Any and all written and/or oral lease agreements relating to real and/or personal property;
3. Any and all Legal Descriptions and/or Surveys on the real property;
4. Any and all communications relating to any un-recorded easements and/or contemplated easements;
5. Confirmation of electrical system separation from adjoining properties (In the event that no confirmation of the same can be obtained prior to the time of closing, the parties agree to having a sufficient portion of the sale proceeds be held in Escrow to satisfy the unknown actual amount of the costs associated with separating the electrical system.);
6. ~~Executed copy of the MOU with the City relating to the access and utility easements;~~
6. ~~7.~~ Updated Tax parcel information;
7. ~~8.~~ Any and all waste/domestic water agreements between adjoining property owners and Seller and/or a written description of how those utilities are being separated;
8. ~~9.~~ Confirmation that Intermountain Gas services has been separated from adjoining parcels;
9. ~~10.~~ Copy of presently existing DEQ land application permit and closure plan;
10. ~~11.~~ Lease Agreement with Mrs. Love and obligations related to the shared irrigation system;
11. ~~12.~~ Lien Releases from any and all contractors and/or material suppliers whom have provided services to the real property within the last 90 days;
12. ~~13.~~ Any and all documents related to the Urban Renewal Plan for the City of Buhl, Idaho Industrial Area;
13. ~~14.~~ Any other documents within the custody or control of Seller which is reasonably requested by the Buyer in conjunction with completing the transaction identified herein.

Buyer Initials        Seller Initials

**EXHIBIT C**

Buyer Initials          Seller Initials

# AGENCY
# DISCLOSURE

## Agency Disclosure Brochure

### A Consumer Guide to Understanding
### Agency Relationships in Real Estate Transactions



Duties owed to Idaho consumers by a real estate brokerage and its licensees are defined in the "Idaho Real Estate Brokerage Representation Act." Idaho Code 54-2082 through 54-2097.

This informational brochure is published by the Idaho Real Estate Commission.

#### Effective July 1, 2017



**Right Now You Are a Customer**   Idaho law says a real estate brokerage and its licensees owe the following "Customer" duties to all consumers in real estate transactions.

> "Agency" is a term used in Idaho law that describes the relationships between a licensee and the parties to a real estate transaction.

- Perform necessary and customary acts to assist you in the purchase or sale of real estate.
- Perform these acts with honesty, good-faith, reasonable skill and care;
- Properly account for money or property you place in the care and responsibility of the brokerage; and
- Disclose "adverse material facts" which the licensee knows or reasonably should have known. These are facts that might significantly affect the desirability or value of the property to a reasonable person, or facts establishing a reasonable belief that one of the parties cannot, or does not intend to, complete obligations under this contract.

If you are a Customer, a real estate licensee is not required to promote your best interests or keep your bargaining information confidential. If you use the services of a licensee and brokerage without a written Representation (Agency) Agreement, you will remain a Customer throughout the transaction.

A Compensation Agreement is a written contract that requires you to pay a fee for a specific service provided by a brokerage, and it is not the same as a Representation Agreement. If you sign a Compensation Agreement, you are still a Customer, but the brokerage and its licensees owe one additional duty

- Be available to receive and present written offers and counter-offers to you or from you.

**You May Become a Client**   If you want a licensee and brokerage to promote your best interests in a transaction, you can become a "Client" by signing a Buyer or Seller Representation (Agency) Agreement. A brokerage and its licensees will owe you the following Client duties, which are greater than the duties owed to a Customer:

- Perform the terms of the written agreement;
- Exercise reasonable skill and care;
- Promote your best interests in good faith, honesty, and fair dealing;
- Maintain the confidentiality of your information, including bargaining information, even after the representation has ended;
- Properly account for money or property you place in the care and responsibility of the brokerage;
- Find a property for you or a buyer for your property, and assist you in negotiating an acceptable price and other terms and conditions for the transaction.
- Disclose all "adverse material facts" which the licensee knows or reasonably should have known, as defined above; and
- Be available to receive and present written offers and counter-offers to you or from you

> The above Customer or Client duties are required by law, and a licensee cannot agree with you to modify or eliminate any of them.

> A "Sold" price of property is not confidential client information, (or either buyers or sellers, and may be disclosed by a licensee.

If you have any questions about the information in this brochure, contact
Idaho Real Estate Commission
(208) 334-3285
irec.idaho.gov

Buyer Initials

Seller Initials

**Agency Representation (Single Agency)** Under "Agency Representation" (sometimes referred to as "Single Agency"), you are a Client and the licensee is your Agent who represents you, and only you, in your real estate transaction. The entire brokerage is obligated to promote your best interests. No licensee in the brokerage is allowed to represent the other party to the transaction.

If you are a seller, your Agent will seek a buyer to purchase your property at a price and under terms and conditions acceptable to you and assist with your negotiations. If you request it in writing, your Agent will seek reasonable proof of a prospective purchaser's financial ability to complete your transaction.

If you are a buyer, your Agent will seek a property for you to purchase at an acceptable price and terms, and assist with your negotiations. Your Agent will also advise you to consult with appropriate professionals, such as inspectors, attorneys, and tax advisors. If disclosed to all parties in writing, a brokerage may also represent other buyers who wish to make offers on the same property you are interested in purchasing.

**Limited Dual Agency** "Limited Dual Agency" means the brokerage and its licensees represent both the buyer and the seller as Clients in the same transaction. The brokerage must have both the buyer's and seller's consent to represent both parties under Limited Dual Agency. You might choose Limited Dual Agency because you want to purchase a property listed by the same brokerage, or because the same brokerage knows of a buyer for your property. There are two kinds of Limited Dual Agency.

**Without Assigned Agents** The brokerage and its licensees are Agents for both Clients equally and cannot advocate on behalf of one client over the other. None of the licensees at the brokerage can disclose confidential client information about either Client. The brokerage must otherwise promote the non-conflicting interests of both Clients, perform the terms of the Buyer and Seller Representation Agreements with skill and care, and other duties required by law.

**With Assigned Agents** The Designated Broker may assign individual licensees within the brokerage ("Assigned Agents") to act solely on behalf of each Client. An Assigned Agent has a duty to promote the Client's best interests, even if your interests conflict with the interests of the other Client, including negotiating a price. An Assigned Agent must maintain the Client's confidential information. The Designated Broker is always a Limited Dual Agent for both Clients and ensures the Assigned Agents fulfill their duties to their respective clients.

**What to Look For in Any Written Agreement with a Brokerage**

A Buyer or Seller Representation Agreement or Compensation Agreement should answer these questions:

- How will the brokerage get paid?
- When will this agreement expire?
- What happens to this agreement when a transaction is completed?
- Can I cancel this agreement, and if so, how?

- Can I work with other brokerages during the time of my agreement?
- What happens if I buy or sell on my own?
- Under an Agency Representation Agreement, am I willing to allow the brokerage to represent both the other party and me in a real estate transaction?

**Real Estate Licensees Are Not Inspectors** Unless you and a licensee agree in writing, a brokerage and its licensees are not required to conduct an independent inspection of a property or verify the accuracy or completeness of any statements or representations made regarding a property. To learn about the condition of a property, you should obtain the advice of an appropriate professional, such as a home inspector, engineer or surveyor.

**Audio/Video Surveillance** Use caution when discussing anything while viewing a property; audio or video surveillance equipment could be in use on listed properties.

If you sign a Representation Agreement or Compensation Agreement with a licensee, the contract is actually between you and the licensee's brokerage. The Designated Broker is the only person authorized to modify or cancel a brokerage contract.

The licensee who gave you this brochure is licensed with:

Name of Brokerage: _____     Phone: _____

**RECEIPT ACKNOWLEDGED**     Rev 02/2017

By signing below, you acknowledge only that a licensee gave you a copy of this Agency Disclosure Brochure.
This document is not a contract, and signing it does not obligate you to anything.

Signature _____     Date _____

Signature _____     Date _____

Buyer Initials

Seller Initials

## EXHIBIT D
## Equipment Excluded from Sale

FREEZER TUNNEL



Buyer Initials          Seller Initials

IN-FEED SHAKER





Buyer Initials        Seller Initials

REYCO WATER VAC ON THE TUNNEL





Buyer Initials    Seller Initials

**EXHIBIT E**

**DESCRIPTION OF INCLUDED PERSONAL PROPERTY\*\***

All personal property described or detailed hereinafter shall be included as Personal Property:

1. **Property Used to Irrigate Farmland.** All personal property located on the Land as of the Effective Date for uses related to irrigation of the farmland, including, but not limited to, all pumps, equipment, water lines and irrigation equipment related to the Love property irrigation system.

2. **Property Located in Storage Shop.** All personal property at this location specifically detailed hereinafter:
   a. Flexband strapping, slip sheets, honeycomb pads, dock door seals with miscellaneous in big box, two (2) pallets of cardboard product, two (2) pallets of paper product and tape; and two (2) pallets of boxes
   b. One (1) pallet of 31 boxes of stretch wrap
   c. Fourteen (14) Werner 6' ladders, five (5) Werner 8' ladders, six (6) Werner 10' ladders
   d. Nifty Tractor MTD weed sprayer
   e. Red mower
   f. King Kutter tractor blade
   g. Big gray dumpster
   h. One (1) pallet of eight (8) bags ice melt
   i. One (1) large flow valve on steel cart
   j. One (1) pallet wheeled paint striper
   k. One (1) red cart with Rubbermaid utility cart
   l. Small desk
   m. Rubbermaid utility cart and Minute mall charger and the following items:
      i. Five (5) pieces – 1 ¼ galv. T&C imp.
      ii. Seventy-One (71) pieces – 10" gskt pvc pipe
      iii. Five (5) pieces – 6" misc. pvc pipe
      iv. Miscellaneous aluminum pipe – approx. 130 pieces with pipe trailer
   n. Kubota Tractor with Loader

3. **Property Located in Machine Shop.** All personal property at this location specifically detailed hereinafter:
   a. 5 jaws
   b. West shelving
      i. Approx. 200 misc. bits/machine tools
   c. Greenerd Arbor Press
   d. Bridgeport Drill Press
   e. Bench grinder
   f. Shop-vac
   g. Cabinet/shelf
      i. Chuck's

Buyer Initials          Seller Initials

        ii.  Mike's
- h.  Lathe
- i.  Tool box
    - i.  Miscellaneous
- j.  Middle shelf
    - i.  100 IFEMS
- k.  Miscellaneous shafts
- l.  N. shelf
    - i.  Miscellaneous lathe equipment
- m.  Dayton belt/disc sander.
- n.  Vise and table with toolbox
- o.  Bench grinder – jet electric
- p.  Delta Drill Press
- q.  Pipe rack:
    - i.  Top 18 pieces
    - ii.  14 pieces
    - iii.  20 pieces
    - iv.  16 pieces
    - v.  Bottom 12 pieces

4.  **Property Located in Maintenance Shop.**  All personal property at this location specifically detailed hereinafter:
- a.  Ecetalean Torch Set
- b.  Two (2) eye-wash stations
- c.  Craftsman 150-psi air compressor
- d.  Dayton 10" bench grinder on stand
- e.  Bolt bend with bolts; red
- f.  Steel work table with big blue vice
- g.  Miller plasma cutter – *serial #LJ430303P* with power cords
- h.  Two (2) Louisville ladders – 24' and 16'
- i.  Miller wire stick welder – *serial #LF265147*, including:
    - i.  hydraulic rams
    - ii.  pump
    - iii.  welding rods
- j.  Plastic cart with plasma cutter cords
- k.  Ellis band saw – model #1800 – *serial #18966798*
- l.  Miscellaneous all thread rod in rack
- m.  Two (2) used oil cans
- n.  Eagle 1960 flammable cabinet

5.  **Property Located in Parts Room (Downstairs).**  All personal property at this location specifically detailed hereinafter:
- a.  Metal racking with miscellaneous pipe fittings and brass valves
- b.  Bathroom and office material:
    - i.  Eleven (11) boxes trash bags
    - ii.  Two (2) boxes facial tissue

Buyer Initials        Seller Initials

iii.  Seven (7) boxes roll tissue
c.  Light bulbs
d.  Miscellaneous stainless-steel bolts and fittings

6.  **Property Located in North Storage Parts and Tool Rooms (Upstairs).** All personal property at this location specifically detailed hereinafter:
a.  Yamaha 4-Wheeler with sprayer
b.  Garden hose
c.  Scale House Walkie Talkies – 6 units and bases
d.  Forty-seven (47) pallets of 332 various sized motors (10HP to 50HP)

7.  **Property Located in Dry Storage.** All personal property at this location specifically detailed hereinafter:
a.  Forty-five (45) pieces: miscellaneous conveyors and shakers

8.  **Other Equipment.** All other equipment specifically detailed hereinafter:
a.  Unit ID #400 – Hyster Forklift; Model S-50-XM; *Serial #D187V31531B* – 5,000 LB
b.  Unit ID #1101 – Hyster Forklift; Model E50-XN-33; *Serial #A268N02456G* – 5,000 LB
c.  Unit ID #1104 – Hyster Forklift; Model E50-XN-33; *Serial #A268N10310L* – 5,000 LB
d.  Unit ID #1105 – Hyster Forklift; Model E50-XN-33; *Serial #A268N10309L* – 5,000 LB
e.  JLG Model 1930ES Serial #200124020
f.  JLG Model 2630ES Serial #200124677
g.  Extra batteries:
i.  Hawker – Model 024E0975 –Serial # EP104132321
ii.  Hawker – Model 024E0975 – EP104132322
iii.  GNB-          Model M2902408521B Serial #GGS0561
iv.  SBS- Model 24-85F-21 Serial # 96310
v.  SBS- Model 24-85F21 Serial #96314

h.  Aero Freezer – Model: 8AE-12C-5D; *Serial # 00112* (YOM: 2011) and all its related parts, including:
i.  Fan motor: 30 hp 1200 rpm 460/3/60 326T DD Super E encapsulated TENV
ii.  Fans:
1.  FAN AL 48/8/-8/35/AL/6WL/BRQ-2.125 SSHW
2.  48" Dia. Fan Panel
iii.  Drive-Belt:
1.  10 hp 1800 460/3/60 215T PF Super E encapsulated TEFC hor.
2.  3 hp 1800 rpm 460/3/60 182TC PF Super E encapsulated TEFC hor.
3.  93:1 OS4 PROTECTION AM ADPTR M1 R77AM182
4.  305:1 OS4 PROTECTION AM ADPTR M1 R87R57AM182
iv.  Conveyor: BELT SS 96" B72-24-16 C2080
i.  LPR Vessel:
i.  National Board Number 22817; rvs *serial # 45751*, (YOM 2011)
1.  MAWP 250psi@300°F MDMT -20°F @250psi/-50°F@85 PSI
ii.  Oil Pot National Board Number 22807; RVS *serial # 45752*, (YOM 2011)
1.  MAWP 300psi@300°F MDMT -50°F @300 PSI

Buyer Initials          Seller Initials

j. LPR Pump 1 Left Side of Control Panel:
   i. Type Teikoku R42-316F4AM/0608TS1-E Item # RVS-190-30-8.3
   ii. Head 106 Cap. 190 GPM
   iii. Motor 3PH, 60 HZ, 460V, 8.3HP, 12 AMPS
   iv. Pole 2 class F. prod. # 1469A-6 (YOM 2010)
   v. RVS *serial # 1909-30-8.3*
k. LPR Pump 2 Right Side of Control Panel
   i. Type Teikoku R42-316F4AM/0608TS1-E Item # RVS-190-30-8.3
   ii. Head 106 Cap. 190 GPM
   iii. Motor 3PH, 60 HZ, 460V, 8.3HP, 12 AMPS
   iv. Pole 2 class F. prod. # 1469A-6 (YOM 2010)
   v. RVS *serial # 1909-30-8.3*
l. Flash Freezer
m. Lewis Freezer – model # 6058, capacity 8,000-10,000 lbs/hour
   i. Coil 1 Evapco TFC4512VF-7-306293 2-15 hp fan motor
   ii. Coil 2 Evapco TFC 45124-7-306303
   iii. Coil 3 Evapco TFC 45123-7-306295-96
   iv. Coil 4 Evapco TFC 45123-7-306295-96
n. Lewis LPR Vessel:
   i. National Board Number 5390; *serial #92934*
      1. MAWP 250psi@650°F MDMT -20°F @ 250psi / -50°F@100psi
o. Lewis LPR Pumps:
   i. LPR pump #1 syndyne HQ22C-R3NHT-O2D2 *serial # 92230971*
      1. Flow 64 GPM, 15 GPM Min., Head 132,6.3HP
   ii. New pump Teikoku Type R-42-217C4AM-0505-51-A, *Serial # FC1247A-17*
      1. Item #RVS-60-45-4.5 Head 157 Capacity 60 GPM, #ph,60Hz
      2. 4.4 HP, 6.8 amps, 2 pole, class 220
   iii. LPR pump #2 syndyne HQ22C-R3NHT-O2D2 *serial # 92230972*
      1. Flow 64 GPM, 15 GPM Min., Head 132,6.3HP
   iv. New pump Teikoku Type R-42-217C4AM-0505-51-A, *Serial # FC1247A-18*
      1. Item #RVS-60-45-4.5 Head 157 Capacity 60 GPM, #ph,60Hz
      2. 4.4 HP, 6.8 amps, 2 pole, class 220

**All items of Personal Property remaining upon the Land at the time of Closing shall be presumptively considered part of the Property subject to this Agreement even if not specifically identified herein. In the that of the Seller, and the Parties shall mutually agree as to the ownership, disposition or removal of items that are contested as to the ownership.

Buyer Initials      Seller Initials

This addendum contains additional provisions which supplement the Purchase and Sale Agreement dated August XX, 2018 between Selkey Buhl, LLC as Buyer and Seneca Foods Corporation as Seller for the purchase and sale of certain real property commonly known as the East portion of 130 7th Avenue South in the City of Buhl, Twin Falls County, State of Idaho.

(a) Seller shall perform and pay for the new survey as well as the recording of the new legal description, Buyer to approve new property lines. This provision specifically excludes the cost of the ALTA survey being performed by Trevor Renn as part of the Buyer's financing.

Buyer Initials

Seller Initials

Document comparison by Workshare 9 on Thursday, August 09, 2018 3:06:07 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\JEXNER\Documents\Real Estate Transactions\Buhl\Buhl Facory Property Sale\Factory and Freezer Sale\PSA - Selkey Buhl LLC. Selky to Seneca 8.3.18 with Comments.docx |
| Description | PSA - Selkey Buhl LLC. Selky to Seneca 8.3.18 with Comments |
| Document 2 ID | C:\Users\JEXNER\Documents\Real Estate Transactions\Buhl\Buhl Facory Property Sale\Factory and Freezer Sale\PSA - Selkey Buhl LLC  Selky to Seneca Sen draft 7.1 8-9-18 Clean.docx |
| Description | C:\Users\JEXNER\Documents\Real Estate Transactions\Buhl\Buhl Facory Property Sale\Factory and Freezer Sale\PSA - Selkey Buhl LLC  Selky to Seneca Sen draft 7.1 8-9-18 Clean.docx |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 40 |

| Deletions | 32 |
|---|---|
| Moved from | 2 |
| Moved to | 2 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 76 |

**EXHIBIT C**

**BILL OF SALE**

## BILL OF SALE

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seneca Foods Corporation ("Seller") does hereby grant, bargain, sell, convey, warrant, and transfer to Selkey Buhl, LLC, ("Buyer"), all of its right, title and interest in and to the personal property, fixtures and equipment listed on Exhibit A and/or which is located on the real property with the common address of 430 7th Ave. South, Buhl, Idaho 83316 (collectively, the "Personal Property") unless specifically excluded in the attached Exhibit A. The said Personal Property is transferred and conveyed by Seller to Buyer AS-IS, in its present condition, without warranty as to condition, express or implied. Seller hereby covenants with Buyer that Seller is the lawful owner of the Personal Property, has good right to sell and convey the Personal Property to Buyer, that the Personal Property is free from all liens, claims and encumbrances, and that Seller will defend the same from and after the date hereof, and that the Seller will execute, acknowledge and deliver any further assignments, conveyances and other assurances, documents and instruments of transfer reasonably requested by Buyer and its successors and assigns for the purpose of assigning, transferring, granting, conveying and confirming the Personal Property to Buyer.

This Bill of Sale shall be binding upon, shall inure to the benefit of, and shall be enforceable by the parties and their respective legal representatives, successors and assigns.

Dated this __30__ day of __August__ , 2018.

SELLER:

Seneca Foods Corporation

By: _____

   Aaron Girard, Senior Vice President of Seneca Foods Corporation

Attachments:
Exhibit A — Description of Personal Property

<u>Exhibit A to Bill of Sale</u>

## DESCRIPTION OF INCLUDED PERSONAL PROPERTY**

All personal property described or detailed hereinafter shall be included as Personal Property:

1. **Property Used to Irrigate Farmland.** All personal property located on the Land as of the Effective Date for uses related to irrigation of the farmland, including, but not limited to, all pumps, equipment, water lines and irrigation equipment related to the Love property irrigation system.

2. **Property Located in Storage Shop.** All personal property at this location specifically detailed hereinafter:
    a. Flexband strapping, slip sheets, honeycomb pads, dock door seals with miscellaneous in big box, two (2) pallets of cardboard product, two (2) pallets of paper product and tape; and two (2) pallets of boxes
    b. One (1) pallet of 31 boxes of stretch wrap
    c. Fourteen (14) Werner 6' ladders, five (5) Werner 8' ladders, six (6) Werner 10' ladders
    d. Nifty Tractor MTD weed sprayer
    e. Red mower
    f. King Kutter tractor blade
    g. Big gray dumpster
    h. One (1) pallet of eight (8) bags ice melt
    i. One (1) large flow valve on steel cart
    j. One (1) pallet wheeled paint striper
    k. One (1) red cart with Rubbermaid utility cart
    l. Small desk
    m. Rubbermaid utility cart and the following items:
        i. Five (5) pieces – 1 ¼ galv. T&C imp.
        ii. Seventy-One (71) pieces – 10" gskt pvc pipe
        iii. Five (5) pieces – 6" misc. pvc pipe
        iv. Miscellaneous aluminum pipe – approx. 130 pieces, but no assurances given as to exact amount of pieces, with pipe trailer
    n. Kubota Tractor with Loader

3. **Property Located in Machine Shop.** All personal property at this location specifically detailed hereinafter:
    a. 5 jaws
    b. West shelving
        i. Approx. 200 misc. bits/machine tools
    c. Greenerd Arbor Press
    d. Bridgeport Drill Press
    e. Bench grinder
    f. Shop-vac

    g.  Cabinet/shelf
         i.  Chuck's
        ii.  Mike's
    h.  Lathe
    i.  Tool box
         i.  Miscellaneous
    j.  Middle shelf
         i.  100 IFEMS
    k.  Miscellaneous shafts
    l.  N. shelf
         i.  Miscellaneous lathe equipment
    m.  Dayton belt/disc sander.
    n.  Vise and table with toolbox
    o.  Bench grinder – jet electric
    p.  Delta Drill Press
    q.  Pipe rack:
          i.  Top 18 pieces
         ii.  14 pieces
       iii.  20 pieces
       iv.  16 pieces
        v.  Bottom 12 pieces

4. **Property Located in Maintenance Shop.** All personal property at this location specifically detailed hereinafter:
    a.  Ecetalean Torch Set
    b.  Two (2) eye-wash stations
    c.  Craftsman 150-psi air compressor
    d.  Dayton 10" bench grinder on stand
    e.  Bolt bend with bolts; red
    f.  Steel work table with big blue vice
    g.  Miller plasma cutter – *serial #LJ430303P* with power cords
    h.  Two (2) Louisville ladders – 24' and 16'
    i.  Miller wire stick welder – *serial #LF265147*, including:
          i.  hydraulic rams
         ii.  pump
       iii.  welding rods
    j.  Plastic cart with plasma cutter cords
    *k.*  Ellis band saw – model #1800 – *serial #18966798*
    l.  Miscellaneous all thread rod in rack
    m.  Two (2) used oil cans
    n.  Eagle 1960 flammable cabinet

5. **Property Located in Parts Room (Downstairs).** All personal property at this location specifically detailed hereinafter:
    a.  Metal racking with miscellaneous pipe fittings and brass valves

   b. Bathroom and office material:
      i. Assorted boxes of trash bags, facial tissue, and roll tissue that are there.
   c. Light bulbs
   d. Miscellaneous stainless-steel bolts and fittings


6. **Property Located in North Storage Parts and Tool Rooms (Upstairs).** All personal property at this location specifically detailed hereinafter:
   a. Yamaha 4-Wheeler with sprayer
   b. Garden hose
   c. Scale House Walkie Talkies – 6 units and bases
   d. Forty-seven (47) pallets of 332 various sized motors (10HP to 50HP)


7. **Property Located in Dry Storage.** All personal property at this location specifically detailed hereinafter:
   a. Forty-five (45) pieces: miscellaneous conveyors and shakers


8. **Other Equipment.** All other equipment specifically detailed hereinafter:
   a. Unit ID #400 – Hyster Forklift; Model S-50-XM; *Serial #D187V31531B* – 5,000 LB
   b. Unit ID #1101 – Hyster Forklift; Model E50-XN-33; *Serial #A268N02456G* – 5,000 LB
   c. Unit ID #1104 – Hyster Forklift; Model E50-XN-33; *Serial #A268N10310L* – 5,000 LB
   d. Unit ID #1105 – Hyster Forklift; Model E50-XN-33; *Serial #A268N10309L* – 5,000 LB
   e. JLG Model 1930ES Serial #200124020
   f. JLG Model 2630ES Serial #200124677
   g. Reinke Alumigator Center Tower Pivot; Model A60G; *Serial #0606-A2809*
   h. Baldor Reliance Industrial Motor *Serial #F1304182940*
   i. Extra batteries:
      i. Hawker – Model 024E0975 –Serial # EP104132321
      ii. Hawker – Model 024E0975 – EP104132322
      iii. GNB-        Model M2902408521B Serial #GGS0561
      iv. SBS- Model 24-85F-21 Serial # 96310
      v. SBS- Model 24-85F21 Serial #96314


   j. Aero Freezer – Model: 8AE-12C-5D; *Serial # 00112* (YOM: 2011) and all its related parts, including:
      i. Fan motor: 30 hp 1200 rpm 460/3/60 326T DD Super E encapsulated TENV
      ii. Fans:
         1. FAN AL 48/8/-8/35/AL/6WL/BRQ-2.125 SSHW
         2. 48" Dia. Fan Panel
      iii. Drive-Belt:
         1. 10 hp 1800 460/3/60 215T PF Super E encapsulated TEFC hor.

      2.  3 hp 1800 rpm 460/3/60 182TC PF Super E encapsulated TEFC hor.
      3.  93:1 OS4 PROTECTION AM ADPTR M1 R77AM182
      4.  305:1 OS4 PROTECTION AM ADPTR M1 R87R57AM182
    iv.  Conveyor: BELT SS 96" B72-24-16 C2080
  k.  LPR Vessel:
    i.  National Board Number 22817; rvs *serial # 45751*, (YOM 2011)
      1.  MAWP 250psi@300°F MDMT -20°F @250psi/-50°F@85 PSI
    ii.  Oil Pot National Board Number 22807; RVS *serial # 45752*, (YOM 2011)
      1.  MAWP 300psi@300°F MDMT -50°F @300 PSI
  l.  LPR Pump 1 Left Side of Control Panel:
    i.  Type Teikoku R42-316F4AM/0608TS1-E Item # RVS-190-30-8.3
    ii.  Head 106 Cap. 190 GPM
    iii.  Motor 3PH, 60 HZ, 460V, 8.3HP, 12 AMPS
    iv.  Pole 2 class F. prod. # 1469A-6 (YOM 2010)
    v.  RVS *serial # 1909-30-8.3*
  m.  LPR Pump 2 Right Side of Control Panel
    i.  Type Teikoku R42-316F4AM/0608TS1-E Item # RVS-190-30-8.3
    ii.  Head 106 Cap. 190 GPM
    iii.  Motor 3PH, 60 HZ, 460V, 8.3HP, 12 AMPS
    iv.  Pole 2 class F. prod. # 1469A-6 (YOM 2010)
    v.  RVS *serial # 1909-30-8.3*
  n.  Flash Freezer
  o.  Lewis Freezer – model # 6058, capacity 8,000-10,000 lbs/hour
    i.  Coil 1 Evapco TFC4512VF-7-306293 2-15 hp fan motor
    ii.  Coil 2 Evapco TFC 45124-7-306303
    iii.  Coil 3 Evapco TFC 45123-7-306295-96
    iv.  Coil 4 Evapco TFC 45123-7-306295-96
  p.  Lewis LPR Vessel:
    i.  National Board Number 5390; *serial #92934*
      1.  MAWP 250psi@650°F MDMT -20°F @ 250psi / -50°F@100psi
  q.  Lewis LPR Pumps:
    i.  LPR pump #1 syndyne HQ22C-R3NHT-O2D2 *serial # 92230971*
      1.  Flow 64 GPM, 15 GPM Min., Head 132,6.3HP
    *ii.*  *New pump Teikoku Type R-42-217C4AM-0505-51-A, Serial # FC1247A-17*
      1.  Item #RVS-60-45-4.5 Head 157 Capacity 60 GPM, #ph,60Hz
      2.  4.4 HP, 6.8 amps, 2 pole, class 220
    iii.  LPR pump #2 syndyne HQ22C-R3NHT-O2D2 *serial # 92230972*
      1.  Flow 64 GPM, 15 GPM Min., Head 132,6.3HP
    *iv.*  *New pump Teikoku Type R-42-217C4AM-0505-51-A, Serial # FC1247A-18*
      1.  Item #RVS-60-45-4.5 Head 157 Capacity 60 GPM, #ph,60Hz
      2.  4.4 HP, 6.8 amps, 2 pole, class 220

**All items of Personal Property remaining upon the Land at the time of Closing shall be presumptively considered to be the that of the Seller, and the Parties shall mutually agree as to the ownership, disposition or removal of items that are contested as to the ownership.

**EXHIBIT D**

**COPY OF IDAHO POWER BILL FOR BUY OUT OF IDAHO POWER FACILITIES**



**Idaho Power Company**
**Rule M - Facility Purchase Price**

**Customer Name:  Cedar Grove Warehousing**
**4145 N. 1500 E., Buhl, ID**
**Date: 03/01/2019**

**Total Sales Price**                                     $649,599

Information contained herein is based upon facilities and purchase price as of the
above mentioned preparation date.  The sales price may be updated based on the
actual date of sale.  Final quotes for buy-out of facilities are subject to an asset
sales agreement  between the Customer and Idaho Power Company, which
requires subsequent approval from the Idaho Public Utilities Commission.  Any sale
of Company assets must be in accordance with both Idaho Power's Rule M,
"Facilities Charge Service" and Idaho Code Section 61-328.

**EXHIBIT E**

**LETTER OF APRIL 15, 2019**

**Boise Office**
1101 W. River St., Ste. 110
P.O. Box 7985
Boise, Idaho 83707
Tel. (208) 629-7447

**Challis Office**
1301 E. Main Ave.
P.O. Box 36
Challis, Idaho 83226
Tel. (208) 879-4488

**Twin Falls Office**
236 River Vista Place
Suite 301
Twin Falls, Idaho 83301
Tel. (208) 969-9585

Fax (all offices)
(208) 629-7559



**David P. Claiborne** *

**S. Bryce Farris**

**Patxi Larrocea-Phillips**

**Evan T. Roth**

**Daniel V. Steenson**

**Andrew J. Waldera** **

**James R. Bennetts** (retired)

**Katie L. Vandenberg** (law clerk)

*Attorneys licensed in Idaho*
* Also licensed in Washington
** Also licensed in Oregon*

**Monday, April 15, 2019**

Tamara L. Boeck
Stoel Rives LLP
500 Capitol Mall, Suite 1600
Sacramento, CA 95814
*via U.S. Mail*
*and via Email: tami.boeck@stoel.com*

RE:   Selkey Buhl / Seneca Foods Transaction
        Idaho power charges

Dear Ms. Boeck:

As you know, this office represents Selkey Buhl, LLC with respect to its acquisition from Seneca Foods Corporation of a portion of its property at 430 7th Avenue South, Buhl, Idaho, 83316. We write at this time in furtherance of our discussions and emails concerning the Idaho Power service obligations, facility use charges and the like, and the extent to which the same were delegated to Selkey Buhl, or retained by Seneca, under the transaction documents. For the reasons explained below, it is our belief and opinion that the outstanding balance of $649,599 to Idaho Power is an obligation of Seneca that must be immediately paid. It is not an obligation of Selkey Buhl.

**The May 10, 2018 Idaho Power Easement**

Instrument No. 2018-007236, Twin Falls County, Idaho, is the easement granted to Idaho Power Company on May 10, 2018, which Seneca contends constitutes constructive notice of the facility charges and other sunk costs. This is an Easement granting certain rights to Idaho Power, and not imposing financial payment obligation on Seneca and its successors. It makes no reference as to any past easement or right-of-way. It is not a deed conveying any ownership rights in existing "Facilities". The consideration was $1.00 and other unidentified valuable consideration. All the instrument does is grant a permanent and perpetual easement and right-of-way, at all times sufficient in width, to perform identified uses related to transmission of electricity and communications lines, and related facilities. Although numerous specific uses are listed – conspicuous by its absence is a conveyance of <u>any</u> "ownership" right in the description



of the easement and the uses Idaho Power could make of the easement.  The Easement identifies the items or objects that are subject to the use activity rights previously listed, which are collectively referred to therein a the "Facilities".  It clearly and unequivocally states easement uses are at the Grantee's (Idaho Power's) expense.  Nothing in the instrument provides notice of charges to be imposed upon the property owner, and to the contrary it indicates expenses are to be paid by Idaho Power.  Any assertion to the contrary lacks any basis in fact.

The Easement further lacks any constructive notice that it addresses future Facilities and uses. Historically, there was no prior document that identified either Facilities or ownership.  The Easement clearly states as to the Facilities all the items and objects will be ". . . in certain locations <u>to be</u> determined by Grantee . . ." (emphasis added).  The first four paragraphs of the Easement have no indication or reference to any ownership rights.  The right to perform identified and specified uses do not convert into ownership rights nor provide any notice of ownership rights claimed by Idaho Power.  If the Easement was for the purpose of conveying ownership rights or to put others on notice of ownership rights, the drafter (Seneca) could have easily stated the same both in the document title and body.  Remember the first paragraph clearly stated . . . "a permanent and perpetual easement and right-of-way, <u>at all times sufficient in width</u> . . . to be able to perform the specific identified uses", which language would not be consistent with an intent to convey ownership rights.  If a purpose of this document was to convey ownership of the Facilities or put others on notice that the Facilities were owned by anyone other than Seneca, Seneca could have simply stated the same.

The third paragraph grants the Grantee specific rights which are wholly inconsistent and unnecessary if Grantee already owns the Facilities when the paragraph specifically provides "Grantee shall also have the right to permit the attachment and/or use or placement of the wires, fixtures, cables, conduits of other companies or parties (all of the same being included within the definition of "Facilities)".  The only reason for the inclusion of this "right" is because Grantee does not own the Facilities.

The fourth paragraph is inconsistent with the notion or argument there was notice of ownership when the paragraph states "The easement and right-of-way granted herein shall be over, on, and across the premises belonging to Grantor(s). . ."  Ownership has nothing to do with over, on, and across.

Further, the fifth paragraph differentiates between the right of ingress and egress and rights and privileges incident thereto.  Ownership is not a right or privilege incident to ingress and egress.  Rights and privileges are described in (i) tree trimming, etc., (ii) excavation, etc., and (iii) the right at Gran<u>tees</u> expense, to perform any of the items previously stated . . . install . . . and repair any and all aspects of <u>Grantee's Facilities</u> . . . etc.  Because none of the Facilities to that date had been identified either as Facilities or Grantee's Facilities, this Easement document is referring to what Idaho power, at its own expense, in the <u>future</u> installs, etc.  There would be no need to include Grantee's Facilities if such right or privilege already existed.  Obviously, the parties identified, labeled and specified Grantee's Facilities in order to differentiate those Facilities from Grantor's Facilities.  Constructive notice thereby provided that electrical facilities were upon the property owned by Seneca, and not claimed by Idaho Power.



The Facilities described would be fixtures once installed and part of the real estate similar, on a smaller scale, to the power items and system in a residential home.  In summary, the Easement notified the public that Idaho Power has a permanent and perpetual easement and right-of-way, sufficient in width to permit and install various uses (the Facilities), separate and apart from similar facilities owned by Grantor, and for rights and privileges incident thereto, but all at Idaho power's expense, and not at the expense of Seneca.  The Easement is much more expansive and articulate than the 1934 and 1958 easements we have previously discussed.  However, it provides information about future facilities, but no notice or claim of ownership in the past of Idaho Power ownership.

**Rule M Implications**

Rule M makes clear a number of items related to ownership rights.  Rule M applies only to eligible customers of Idaho Power.  An eligible customer of Idaho Power may request that Idaho Power (1) design, install, <u>own</u> and operate (2) transformers and other facilities (3) beyond the Point of Delivery.  Accepting such a request is at the option of Idaho Power.  In exchange therefore, Idaho Power may require the payment of monthly facility charges to Idaho Power.

**Seneca Knowledge and Behavior**

It is clear Seneca knew of this lease-type of arrangement with Idaho Power.  Seneca received and paid a monthly facility charge in excess of $30,000.  Selkey Buhl has previously pointed out Seneca's violation of both the Purchase and Sale Agreement and the Bill of Sale, and Seneca's behavior to conceal the ownership of Idaho Power.  In the Purchase and Sale Agreement, Seneca had the ability to exclude any items from the conveyance.  Seneca utilized the exclusion and specifically identified the items to be excluded.  Seneca did not exclude any Idaho Power items or Facilities.

Seneca was obligated to reveal all leases to Selkey Buhl so Selkey Buhl could make choices including to continue the lease, buy-out the lease or terminate the lease.  Seneca revealed some leases, but apparently intentionally failed to reveal the Idaho Power obligation.  Seneca and Idaho Power had a lease arrangement in all respects other than the title.  Seneca knew Selkey Buhl would be concerned about a $600,000+ lease obligation and still failed to reveal the same.

**Purchase and Sale Agreement**

Seneca, in the Purchase and Sale Agreement, at paragraph 19, "Condition Of Property At Closing", agreed "to . . .  assume those obligations with respect to the Property as are expressly stated in Section 5.  Buyer does not agree to assume any other obligations with respect to the Property except for those obligations stated in Section 5."  Section 5 lists no obligations to Idaho Power.  Seneca and Selkey Buhl agreed that Selkey Buhl did not assume any other obligations.  Seneca knew of Idaho Power's ownership of property and failed to reveal the same.  Seneca knew if Selkey Buhl did not assume payments to Idaho Power, Idaho



Power would discontinue power to Selkey Buhl.  Seneca knew its misrepresentation to Selkey Buhl, among other things, through these paragraphs 5 and 19, were material misrepresentations.

Further, paragraph 6.1 (iv) clearly obligated Seneca to provide the "Due Diligence materials as identified and requested by Buyer within Exhibit B".  Seneca specifically failed to fulfill number 2 on Exhibit B which provides: "2.  Any and all <u>written</u> and/or <u>oral</u> lease agreements relating to the <u>real</u> and/or <u>personal</u> property."  Selk requested all such information in regards to all lease agreements and Seneca chose to fail to reveal its lease payments to Idaho Power for repayment of Idaho Power property which Seneca continued to pay monthly for years, although Seneca was apparently not using the property for years.  The continued payments by Seneca prevented Idaho Power from removing Idaho Power's property and billing Seneca $600,000+.  Further, Seneca's continued monthly payments prevented Idaho Power from filing a lien which would have alerted Selkey Buhl to Idaho Power's claim.

Further, Seneca intentionally violated paragraph 13 of Exhibit B.  Selk had requested a copy of the monthly Idaho Power billing to give Selkey Buhl a rough idea of the monthly power charges.  Because Selkey Buhl was only aware of a monthly user expense not receiving a copy of the monthly bill was an annoyance, but Selkey Buhl was not satisfied or waiving Seneca's hiding of a $600,000+ Idaho Power claim.

<u>Bill of Sale</u>

While it may be convenient to disregard clear legal language in a Bill of Sale, no court would appreciate such a dismissive attitude.  To begin with, both the factual information and documents in the sale clearly support Selkey Buhl.  While Selkey Buhl believes Idaho Power's property are fixtures, it is a misplaced attitude to dismiss an entire separate document which specifically deals with the "ownership" of personal property by simply proclaiming someone should have been put on notice of past "ownership" of property by a document which only speaks of future "ownership".

In addition to the May 10, 2018 Easement not supporting Seneca's claim, that Easement does not overcome either the Bill of Sale or the Purchase and Sale Agreement, but is consistent with said transaction documents.

While Selkey Buhl does not believe Idaho Power's claim is for personal property, even if Idaho Power's claim was personal property, Seneca specifically transferred all the personal property on the premises by the Bill of Sale.  The Bill of Sale is quite explicit.  It conveys all of Seneca's right, title, and interest in and to the personal property, fixtures and equipment listed on Exhibit A <u>and</u> to all <u>other</u> personal property, fixtures and equipment otherwise located on the real property.

Exhibit A is very explicit as to the personal property being conveyed.  The title "Description Of Included Personal Property**" contains two asterisks.  The asterisks are clearly explained on page 5 of the Bill of Sale which states:  "<u>A</u>ll items of Personal Property remaining upon the Land at the time of Closing shall be presumptively considered to be that of the Seller, and the Parties shall mutually agree as to the ownership,



disposition or removal of items that are contested as to the <u>ownership</u>" (emphasis added).  This results in a rather simple situation.  All of Idaho Power's property remained upon the land at the time of closing.  Selkey Buhl was unaware and received no notice that Idaho Power contested ownership of any personal property.  Seneca was fully aware of Idaho Power's claims and was paying over $30,000 a month for Idaho Power's ownership claims.

Seneca, even aware of over $600,000 of Idaho Power property claims, signed and provided a Bill of Sale which was absolutely false.  Seneca positively, clearly, and specifically represented to Selkey Buhl all the personal property remaining upon the land at Closing was considered to be that of Seneca.  Seneca knew of Idaho Power's ownership claim but in dereliction of Seneca's specific representation did not contest the presumption.  Rather, Seneca maliciously planned to respond after the Closing when Selkey Buhl first became aware of Idaho Power's ownership claim to allege Selkey Buhl failed to do due diligence thus Selkey Buhl becomes responsible and liable for the Idaho Power obligation.  It is hard to view Seneca's disregard and failure to comply with its litany of legal obligations to reveal Idaho Power's ownership in conjunction with its baseless, flimsy excuses to prove anything but Seneca intentionally concealed the claim.

Finally, Seneca's representative with great pride, among other things, explained and showed the room filled with transformers and expressed how cool it was to have the same.  That representative presumably was aware the wonderful room full of transformers were all owned by Idaho Power and being paid for in the monthly payments at a rate in excess of $30,000, yet disclosed nothing.  On a number of occasions, Seneca's representative was directly asked by Selk what Seneca was paying Idaho Power and for what and to see a monthly bill so Selkey Buhl would not need to guess at budgeting costs.  The Seneca representative referred Selk to Idaho Power, rather than answering the inquiry directly.  When Selk contacted Idaho Power, Idaho Power refused to divulge a customer's information to a third party.

Selk told Seneca's representative of Idaho Power's refusal and rather than providing the monthly payments and reasons to Selk, or otherwise giving a straight forward and direct answer, the representative failed to notify Idaho Power with permission for Idaho Power to reveal the monthly payments and for what purposes.  The representative told Selk to try again, which Selk did and Selk reported to the representative the same response.  The Seneca representative concluded Selk's quest by stating the information would need to come from Idaho Power.  It did not.

**<u>Prior Seneca Alleged Basis</u>**

The 1934 Easement does not put Selkey Buhl on notice of an "ownership" interest and whether such ownership interest exists 84 years later.  The 1958 Easement does not put Selkey Buhl on notice of an "ownership" interest nor whether such interest exists 60 years later.  Neither easement identifies fixtures versus personal property.  The May 10, 2018 Easement does not specify or categorize fixtures versus personal property.  Rather, this easement identifies items and simply labels them facilities.



Unless Seneca has some other basis for defending its action and inactions, and if Seneca does not agree in writing within the next two weeks to pay Idaho Power the current balance of $649,599 within the next thirty (30) days, and copy Selkey Buhl with full payment to Idaho Power, Selkey Buhl intends to commence suit.  Suit will include claims for breach of contract, fraud, intentional misrepresentation, negligent misrepresentation, promissory estoppel and equitable estoppel.

Thank you for your attention to the foregoing.

Very truly yours,

David P. Claiborne
*david@sawtoothlaw.com*

Evan T. Roth
*evan@sawtoothlaw.com*

cc:     Pat DeWayne, pdewayne@dewanelaw.com
        Ray Selk, ray@cedargrovewarehouse.com